Michael Mugmon (SBN 251958)
WILMER CUTLER PICKERING HALE
AND DORR LLP
50 California Street, Suite 3600
San Francisco, CA 94111
Telephone: (628) 235-1000
Fax: (628) 235-1001
michael.mugmon@wilmerhale.com

Noah A. Levine (*pro hac vice*)
Cassandra Mitchell (SBN 321141)
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Fax: (212) 230-8888
noah.levine@wilmerhale.com
cassie.mitchell@wilmerhale.com

John Wells (*pro hac vice*)
Benjamin Chapin (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6443
Fax: (202) 663-6363
john.wells@wilmerhale.com
benjamin.chapin@wilmerhale.com

*Counsel for Defendant*
*Bank of America, N.A.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| Ricky Chen and Amin Wu, individually and as representatives of the class,<br><br>Plaintiffs,<br><br>v.<br><br>Bank of America, N.A.,<br><br>Defendant. | Case No. 3:25-cv-3790-EMC<br><br>**DEFENDANT BANK OF AMERICA, N.A.'S MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Hon. Edward M. Chen<br>Courtroom 5, 17th Floor<br>Date:   March 12, 2026<br>Time:   1:30 PM |

# **TABLE OF CONTENTS**

Page

NOTICE OF MOTION AND MOTION TO DISMISS ...................................................................1

STATEMENT OF REQUESTED RELIEF ....................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................1

ISSUES TO BE DECIDED ...........................................................................................................2

BACKGROUND ...........................................................................................................................3

      A.     EFTA And Regulation E......................................................................................... 3

      B.     Article 4A of the Uniform Commercial Code ......................................................... 4

      C.     Plaintiffs' EFTA Claims ........................................................................................ 6

STANDARD OF REVIEW ...........................................................................................................7

ARGUMENT .................................................................................................................................7

I.     Plaintiffs' Claims Must Be Dismissed Because EFTA Does Not Apply to Wire Transfers ...........................................................................................................7

      A.     EFTA's Text Confirms That It Does Not Apply To The Transactions Here ........................................................................................................................ 8

      B.     Statutory Context Confirms EFTA Does Not Apply To The Transactions Here ...................................................................................................................... 10

      C.     Extensive Case Law Holds EFTA Does Not Apply To The Transactions Here ...................................................................................................................... 13

      D.     Regulatory Guidance Confirms EFTA Does Not Apply Here ............................ 15

      E.     Plaintiffs' Interpretation Threatens Significant Uncertainty And Instability For Wire Transfers ............................................................................. 18

II.    Plaintiffs Fail To Plausibly Allege An "Unauthorized Transfer" .....................................19

III.   Dismissal Should Be With Prejudice ...............................................................................22

CONCLUSION ............................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Virga*,
2017 WL 1179142 (E.D. Cal. Mar. 29, 2017) ................................................................20

*Arkansas Best Corp. v. C.I.R.*,
485 U.S. 212 (1988) ........................................................................................................8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..............................................................................................7, 15, 20

*Bakhtiari v. Comerica Bank, Inc.*,
2024 WL 3405340 (N.D. Cal. July 12, 2024) ...............................................................13

*Bodley v. Clark*,
2012 WL 3042175 (S.D.N.Y. July 23, 2012) ...............................................................14

*BPi Bright Power, Inc. v. Umpqua Holding Corp.*,
669 F. Supp. 3d 904 (N.D. Cal. 2023) ...........................................................................5

*Brown v. Gardner*,
513 U.S. 115 (1994) ........................................................................................................9

*Eclectic Properties East, LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) .........................................................................................21

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ......................................................................................................13

*Fischer & Mandell LLP v. Citibank, N.A.*,
2009 WL 1767621 (S.D.N.Y. June 22, 2009) ..............................................................14

*Guarnieri v. Be Money Inc.*,
2022 WL 11381916 (C.D. Cal. Oct. 18, 2022)..............................................................20

*Hunter v. Citibank, N.A.*,
2010 WL 2509933 (N.D. Cal. Feb. 3, 2010) .............................................................5, 18

*Kanji v. Bank of America, N.A.*,
2020 WL 8175548 (C.D. Cal. Aug. 25, 2020)..............................................................13

*Marx v. General Revenue Corp.*,
568 U.S. 371 (2013)........................................................................................................11

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011) .........................................................................................7

*McClellon v. Bank of America, N.A.*,
    2018 WL 4852628 (W.D. Wash. Oct. 5, 2018) ........................................................................13

*Moore v. Mars Petcare US, Inc.*,
    966 F.3d 1007 (9th Cir. 2020) .................................................................................................7

*Napear v. Bonneville International Corp.*,
    669 F. Supp. 3d 948 (E.D. Cal. 2023).....................................................................................20

*Nazimuddin v. Wells Fargo Bank N.A.*,
    2024 WL 3431347 (S.D. Tex. June 24, 2024), report *and recommendation
    adopted*, 2024 WL 3559597 (S.D. Tex. July 25, 2024), *aff'd* 2025 WL 33471
    (5th Cir. Jan. 6, 2025) ...........................................................................................................14

*New York v. Citibank, N.A.*,
    763 F. Supp. 3d 496 (S.D.N.Y. 2025)..................................................................................6, 15

*Parents for Privacy v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) ...............................................................................................22

*Pope v. Wells Fargo Bank, N.A*,
    2023 WL 9604555 (D. Utah Dec. 27, 2023)............................................................................14

*Powerex Corp. v. Reliant Energy Services, Inc.*,
    551 U.S. 224 (2007)..................................................................................................................9

*Pulsifer v. United States*,
    601 U.S. 124 (2024)................................................................................................................11

*Sanchez v. Navy Federal Credit Union*,
    2023 WL 6370235 (C.D. Cal. Aug. 14, 2023).........................................................................21

*Stepakoff v. IberiaBank Corp.*,
    637 F. Supp. 3d 1309 (S.D. Fla. 2022) ..............................................................................14, 15

*Sturgeon v. Frost*,
    587 U.S. 28 (2019)..................................................................................................................11

*Tristan v. Bank of America*,
    2023 WL 4417271 (C.D. Cal. June 28, 2023) ....................................................................21, 22

*Trivedi v. Wells Fargo Bank, N.A.*,
    609 F. Supp. 3d 628 (N.D. Ill. 2022) ......................................................................................14

*United States v. Mariner Health Care, Inc.*,
    552 F. Supp. 3d 938 (N.D. Cal. 2021) ....................................................................................11

*Vukmirovic v. Ashcroft*,
    362 F.3d 1247 (9th Cir. 2004) ..................................................................................................8

*Walling by Walling v. Bank of America, N.A.*,
    782 F. Supp. 3d 280 (D.S.C. 2025)........................................................................................15

*Wright v. Citizen's Bank of East Tennessee*,
    640 F. App'x 401 (6th Cir. 2016) ...........................................................................................14

*Zengen, Inc. v. Comerica Bank*,
    41 Cal. 4th 239 (2007) ............................................................................................................4

**Docketed Cases**

*Citibank, N.A. v. New York ex rel. James*,
    No. 25-1179 (2d Cir.)...............................................................................................................7

*Citibank, N.A. v. New York ex rel. James*,
    No. 25-2105 (2d Cir.)...................................................................................................7, 18, 19

*New York v. Citibank, N.A.*,
    No. 1:24-cv-659 (S.D.N.Y.).................................................................................................7, 16

**Statutes**

15 U.S.C.
    § 1693.......................................................................................................................................3
    § 1693a............................................................................................................................. *passim*
    § 1693c.....................................................................................................................................4
    § 1693d.....................................................................................................................................4
    § 1693f.................................................................................................................................4, 21

Cal. Com. Code
    § 11103.....................................................................................................................................5
    § 11104..................................................................................................................................5, 10
    § 11108..................................................................................................................................2, 6
    § 11201.....................................................................................................................................5
    § 11203.....................................................................................................................................5
    § 11204.....................................................................................................................................5
    § 11305.....................................................................................................................................5
    § 11402.....................................................................................................................................6

U.C.C.
    § 4-A ........................................................................................................................................4
    § 4A-104(a)...............................................................................................................................5

**Regulations**

12 C.F.R.
    pt. 210, subpt. B, Appendix A ...............................................................................................16
    § 205.3......................................................................................................................................4
    § 1005.3.................................................................................................................................4, 10

*Definitions of Transmittal of Funds and Funds Transfer*,
78 Fed. Reg. 72,813, 72,814 (Dec. 4, 2013) ..........................................................................17

*Electronic Fund Transfer Act*,
44 Fed. Reg. 18,468 (Mar. 28, 1979)..................................................................................4, 10

*Electronic Fund Transfers (Regulation E)*,
77 Fed. Reg. 6,194 (Feb. 7, 2012) ........................................................................................16

**Other Authorities**

*Examining Scams and Fraud in the Banking System and Their Impact on
Consumers* Before the S. Comm. Banking, Hous., & Urban Affairs (Feb. 1,
2024), https://tinyurl.com/5n97yaw8 ....................................................................................18

FDIC, *Consumer Compliance Examination Manual* (2022),
https://tinyurl.com/3c9refbt ...................................................................................................17

Fed. Rsrv. Bd., *Consumer Compliance Handbook* (2016),
https://tinyurl.com/3wfwdsma ...............................................................................................16

Fed. Rsrv. Bd., *The Fedwire Funds Service: Assessment of Compliance with the
Core Principles for Systemically Important Payment Systems* (July 2014),
https://tinyurl.com/4vwmcjs8 ...................................................................................................3

*Message from the Director–Wire Transfer Scams and Ways to Protect Yourself*,
OCC (July 2023), https://tinyurl.com/38pc7bxu ...................................................................17

OCC, *Comptroller's Handbook: Payment Systems* (v. 1.0, Oct. 2021),
https://tinyurl.com/yn8c288b ................................................................................................17

S. Rep. No. 95-915, *reprinted in* 1978 U.S.C.C.A.N. 9403 ......................................................3, 12

*What's in Your Digital Wallet?: A Review of Recent Trends in Mobile Banking
and Payments*, Hybrid Hearing Before The Task Force on Fin. Tech. of the H.
Comm. on Fin. Servs., 117th Cong. (2022) ..........................................................................18

U.S. Dep't of Treasury, FinCEN, *Feasibility of a Cross-Border Electronic Funds
Transfer Reporting System Under the Bank Secrecy Act* (Oct. 2006),
https://tinyurl.com/krh9thxp ..................................................................................................17

*Users' Rights Under EFTA in the Event of Bank Error Regarding an Electronic
Wire Transfer*, FDIC-94-21, 1994 WL 393720 (FDIC, Apr. 26, 1994) ...............................17

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE THAT, on March 12, 2026, or as soon thereafter as the matter may be heard, in Courtroom 5 – 17th Floor of the U.S. District Court for the Northern District of California, San Francisco Division, Defendant Bank of America, N.A. ("Bank of America") will and hereby does move to dismiss Plaintiffs' Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). This Motion is based on this Notice of Motion and the accompanying Memorandum of Points and Authorities.

## STATEMENT OF REQUESTED RELIEF

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Bank of America requests that the Court dismiss all of Plaintiffs' claims with prejudice.

## MEMORANDUM OF POINTS AND AUTHORITIES

For decades, there has been a settled understanding among courts, regulators, legislators, and even consumer advocates that, except for certain cross-border remittance transfers not relevant here, the Electronic Fund Transfer Act ("EFTA") exempts wire transfers from its coverage—the full, end-to-end wire transfer, including the debit of the funds from the consumer's account. Congress legislated this approach, enacting the wire-transfer exemption as one of five exceptions to EFTA's definition of "electronic funds transfer"—an exception that this brief refers to as Section 7(B), based on its statutory enumeration. *See* 15 U.S.C. § 1693a(7)(B).

Plaintiffs' lawsuit faults Bank of America for following this settled understanding, arguing that EFTA, in fact, has covered wire transfers all along, and that Section 7(B) has only ever exempted one part of a wire transfer from EFTA's coverage—the bank-to-bank segment or segments of the transfer. Plaintiffs' argument is wrong. The decades-long, settled understanding that Section 7(B) exempts an entire wire transfer, end to end, not only has history on its side, but is also the only interpretation that accords with EFTA's plain text and structure, avoids rendering an entire provision of EFTA superfluous, and ensures that all parts of EFTA's "electronic fund transfer" definition and its exceptions are given effect as a coherent statutory scheme. This interpretation of Section 7(B) is also the only one that respects the similarly long-settled understanding that Article 4A of the Uniform Commercial Code, not EFTA, governs consumer

wire transfers.  Plaintiffs' interpretation, in contrast, would displace Article 4A's coverage because, by its terms, Article 4A does not apply to a wire transfer if "any part" of that transfer is governed by EFTA.  Cal. Com. Code § 11108(a).  That displacement would have serious ramifications, rendering inapplicable Article 4A's many rules governing numerous issues arising in wire transfers that go beyond the few matters that EFTA regulates for the specific subset of transfers to which it applies.

In arguing that EFTA should be read to cover parts of a wire transfer, Plaintiffs follow in the shoes of the New York Attorney General, who advocated for the same newly conceived, unprecedented reinterpretation of EFTA in a lawsuit against Citibank, N.A.  The district court in that case endorsed the Attorney General's reading, but soon thereafter certified its ruling for interlocutory appeal, recognizing that its decision was contrary to the decisions of numerous other courts and would have serious ramifications.  The Second Circuit granted Citibank leave to appeal, and briefing on the appeal is set to conclude in March 2026.  Bank of America is not aware of any court, regulator, or legislative body that, before the *Citibank* litigation, had endorsed or recognized the novel theory advanced in that case and repeated here.  Nevertheless, Plaintiffs seek to capitalize on that outlier decision and impose sweeping liability on Bank of America for conduct never before thought to be governed by EFTA.

The Amended Complaint should be dismissed with prejudice because EFTA does not apply to any of the series of transactions that make up a wire transfer.  Plaintiffs' position contradicts both EFTA's text and long-settled, uniform case law and regulatory guidance prior to the *Citibank* decision.  This alone is sufficient reason to dismiss the Amended Complaint with prejudice, as the legal deficiency cannot be cured by pleading additional facts.  The Amended Complaint also should be dismissed because, notwithstanding its addition of some new factual allegations, Plaintiffs still do not plausibly allege that their transfers were "unauthorized" within the meaning that EFTA ascribes to that term.

## ISSUES TO BE DECIDED

1.  Whether EFTA applies to the transactions that form the basis of Plaintiffs' claims, despite EFTA's text and courts' and regulators' well-settled understanding to the contrary.

2. Whether, even if EFTA applied to the transactions, Plaintiffs have plausibly alleged that the transactions were "unauthorized" under EFTA.

## BACKGROUND

### A.      EFTA And Regulation E

In 1978, Congress enacted EFTA to "provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems."  15 U.S.C. § 1693(b) (1978).  At the time, banks had been processing wire transfers through the Federal Reserve for 60 years.  *See* Fed. Rsrv. Bd., *The Fedwire Funds Service: Assessment of Compliance with the Core Principles for Systemically Important Payment Systems* 7 (July 2014), https://tinyurl.com/4vwmcjs8.  In EFTA, Congress focused instead on "relatively new" or "young" payment services like "automated teller machines, … pay-by-phone systems, … direct deposit and automatic payments, … and point-of-sale transfers."  S. Rep. No. 95-915, *reprinted in* 1978 U.S.C.C.A.N. 9403, 9404.

Congress specified EFTA's coverage in the statute's definition of the term "electronic fund transfer."  15 U.S.C. § 1693a(7).  EFTA defines that term to mean "any transfer of funds … initiated through an electronic terminal, telephone instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account."  *Id.*  Like the legislative history, this definition specifies that the term includes "point-of-sale transfers, automated teller machine transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone."  *Id.*  After this definition, Congress also specified what "electronic fund transfer" "does not include," describing five types of transfers or transactions excepted from Section 7's coverage.  *Id.* § 1693a(7)(A)-(E).  The second exception, Section 7(B), is the relevant exception here.  Using the same term "transfer of funds" as Section 7's definition, Section 7(B) provides that the term "electronic fund transfer" "does not include … any transfer of funds, other than those processed by automated clearinghouse, made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a

consumer." *Id.* § 1693a(7)(B).  Plaintiffs concede that the "service" referred to in Section 7(B) is a "wire transfer service."  Dkt. 38 at 3 n.1.

The Board of Governors of the Federal Reserve, in promulgating Regulation E to implement EFTA, provided for the same exemption. *See Electronic Fund Transfer Act*, 44 Fed. Reg. 18,468 (Mar. 28, 1979).  In an exemption titled simply "*Wire transfers*," Regulation E excluded from its ambit "[a]ny wire transfer of funds for a consumer through the Federal Reserve Communications System or other similar network that is used primarily for transfers between financial institutions or between businesses." *Id.* at 18,481 (12 C.F.R. § 205.3(b)); *see also* 12 C.F.R. § 1005.3(c)(3) (current version).  In other words, EFTA expressly exempted, from the outset, wire transfers—transfers of money that rely on interbank transfers between Federal Reserve or other banks.  As discussed in greater detail below, *infra* Parts I.C and I.D, courts and regulators have, for decades, operated under that understanding.

For the electronic fund transfers that EFTA does cover, the statute primarily does two things.  First, EFTA establishes a disclosure regime under which banks that offer EFTA-covered transfers must disclose the terms governing those transfers and transaction details, for example on monthly statements. 15 U.S.C. §§ 1693c, 1693d.  Second, EFTA prescribes investigation obligations and procedures and allocates liability for instances when electronic fund transfers go awry. *Id.* §§ 1693f(a)-(b), 1693g(a).

**B.      Article 4A of the Uniform Commercial Code**

EFTA's exemption of wire transfers does not leave consumer wire transfers unregulated. Instead, consumer wire transfers have long been understood to be governed by Article 4A of the U.C.C.  Article 4A, which was developed following EFTA's enactment, was specifically designed to provide a "comprehensive body of law that defines the rights and obligations that arise from wire transfers." U.C.C. § 4-A, Prefatory Note (1989).  All 50 States and the District of Columbia codified Article 4A.  California did so "as Division 11 of the California Uniform Commercial Code, entitled 'Funds Transfers,'" *Zengen, Inc. v. Comerica Bank*, 41 Cal. 4th 239, 247 (2007).  As California courts have recognized, "Division 11 applies to 'funds transfers,' and provides 'a comprehensive body of law to govern the rights and obligations resulting from wire transfers.'"

*BPi Bright Power, Inc. v. Umpqua Holding Corp.*, 669 F. Supp. 3d 904, 906 (N.D. Cal. 2023) (quoting *Zengen*, 41 Cal. 4th at 253)).

Article 4A defines "funds transfer" consistent with the long-settled understanding of a wire transfer. Section 4A-104, codified in California as California Commercial Code § 11104, defines the term as "the *series* of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order." Cal. Com. Code § 11104(a) (emphasis added); *see also* U.C.C. § 4A-104(a). A wire transfer thus starts with a "payment order," which is defined to mean "an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary" in which "the receiving bank is to be reimbursed by debiting an account of, or otherwise receiving payment from, the sender." Cal. Com. Code § 11103(a)(1). In other words, a payment order is a customer's instruction to their bank to transfer a certain amount of money from the customer (presumptively to be debited from the customer's account) to another person or entity.

Article 4A includes protections for unauthorized wire transfers. As a general matter, for the sender to be liable for her payment order under Article 4A, that order must have been either (1) authorized by the sender, or (2) accepted by the bank in good faith and verified by the bank pursuant to a commercially reasonable security procedure to which the sender and bank agreed in advance. Cal. Com. Code §§ 11201-11204. Article 4A's well-established liability regime "encourages quick and inexpensive wire transfers, and in turn facilitates the voluminous daily financial transactions upon which the nation's economy depends, by setting out a definite set of requirements for banks to adhere to when engaging in … wire transfers." *Hunter v. Citibank, N.A.*, 2010 WL 2509933, at *6 (N.D. Cal. Feb. 3, 2010). Article 4A also provides important protections for consumers that send and receive wires, beyond the few matters covered in EFTA. For example, a bank may be liable to consumers who send wire transfers ("originators") or who receive wire transfers ("beneficiaries") if the bank mishandles a transfer resulting in delay or noncompletion of the transfer. *See* Cal. Com. Code § 11305. Consumers are also protected by Article 4A's rules regarding the payment obligations of the parties to a wire transfer, including provisions that

(i) discharge an originator's obligation to a beneficiary upon acceptance of a payment order by the beneficiary's bank; (ii) require a beneficiary's bank that accepts a payment order to pay the amount of the order to the beneficiary; and (iii) excuse a sender's obligation to pay for her payment order if the funds transfer is not completed. *Id.* §§ 11402(c), 11404, 11406.

Importantly, EFTA and Article 4A are deliberately different and, as noted, almost entirely mutually exclusive, legal regimes. Article 4A makes this so, stating that it "does not apply to a funds transfer *any part of which* is governed by [EFTA]," with limited exceptions for remittance transfers, a type of transaction not relevant here. Cal. Com. Code § 11108(a) (emphasis added).

### C. Plaintiffs' EFTA Claims

Plaintiffs allege that, on September 16, 2024, funds were transferred from their accounts to an entity called Ship N Slide LLC. Amended Complaint ("AC"), Dkt. 46 ¶¶ 28, 47-48. Plaintiffs acknowledge the funds were "transferred through Fedwire or a similar wire transfer system." *Id.* ¶ 12. The Amended Complaint alleges that a fraudster, purporting to represent Bank of America, contacted Plaintiff Chen, first by text message and then by phone call and FaceTime. *Id.* ¶¶ 29-36. To establish that the fraudster, and not Mr. Chen, sent the transfers at issue, the Amended Complaint alleges "upon information and belief" that the fraudster "gained access to Mr. Chen's iPhone through the FaceTime call using Apple's 'remote control' feature." *Id.* ¶ 38. The Amended Complaint then undermines that very allegation, however, averring that Mr. Chen "does not recall allowing remote access to his phone" and "[a]t most…believed that he had shared his screen with the caller." *Id.* ¶¶ 39-40. The Amended Complaint does not allege that merely sharing his screen could have enabled the fraudster to control Plaintiffs' two accounts. Nevertheless, the Amended Complaint alleges that the "fraudster was able to take over Mr. Chen's iPhone, including its BANA iPhone application." *Id.* ¶ 41. The Amended Complaint further alleges that Plaintiffs later told Bank of America they "did not authorize any transactions, press any buttons to effectuate any transfers, or respond to any text messages to confirm any account activity." *Id.* ¶ 58.

The Amended Complaint otherwise consists of legal conclusions and argument. Among those legal arguments is a citation (AC ¶ 82) to *New York v. Citibank, N.A.*, 763 F. Supp. 3d 496

(S.D.N.Y. 2025). As noted, the district court in that case certified its order for an interlocutory appeal, having done so before Plaintiffs filed their initial Complaint here. *See* Mem. & Order, *New York v. Citibank, N.A.*, No. 1:24-cv-659 (S.D.N.Y. Apr. 22, 2025), Dkt. 73. In its certification order, the *Citibank* district court acknowledged that numerous courts have adopted "a contrary view of the scope of [Section 7(B)]," that "decades of legislative and regulatory history" were relevant to the question, and that its order narrowly construing the EFTA wire-transfer exemption would have "immediate and consequential impacts on the banking and financial services industries." *Id.* at 7-8, 10. As a result, the district court found that "exceptional circumstances" supported immediate appellate review of its novel interpretation of EFTA. *Id.* at 9. In September, the Second Circuit granted leave for that interlocutory review. *See* Leave to Appeal, *Citibank, N.A. v. New York ex rel. James*, No. 25-1179 (2d Cir. Sept. 3, 2025), Dkt. 25. Briefing in that appeal is underway, and will conclude in March 2026. *See Citibank, N.A. v. New York ex rel. James*, No. 25-2105 (2d Cir.).

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint's factual allegations must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1016 (9th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[T]he complaint cannot survive a motion to dismiss unless it alleges facts that plausibly (not merely conceivably) entitle plaintiff[s] to relief." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067-1068 (9th Cir. 2011). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*

## ARGUMENT

### I.     Plaintiffs' Claims Must Be Dismissed Because EFTA Does Not Apply to Wire Transfers

Plaintiffs' claims depend on their argument that Section 7(B) exempts from EFTA's coverage only one of the series of transactions comprising a wire transfer—the intermediate, bank-to-bank transfer of the funds. The questions for this Court thus are: Does Section 7(B) exempt

from the definition of "electronic fund transfer" the full end-to-end transfer of funds, including the debit of the sender's account?  Or, as Plaintiffs argue, does Section 7(B) exempt from the definition of "electronic fund transfer" only the interbank segment of the wire transfer?  EFTA's text answers that question, confirming that it is the former:   Section 7(B) exempts from the definition of "electronic fund transfer" a wire transfer as a whole, end to end—*including* the deduction of funds from the sender's account—and *not just* the interbank segment.  Extensive case law and regulatory guidance confirms this interpretation.  The central premise underlying Plaintiffs' claims—that Bank of America committed a "mistake of law" by addressing their wire transfers under Article 4A, not EFTA, *e.g.*, AC ¶¶ 80-81—has no support in the statutory text, the context in which the wire-transfer exemption exists within EFTA, the weight of the case law, or regulatory guidance.

### A.    EFTA's Text Confirms That It Does Not Apply To The Transactions Here

Section 7 of EFTA follows a well-worn path of statutory drafting, in which Congress sets out a general definition or rule of application and then carves out exceptions to that rule by specifying that subsets of the covered subject are excluded.  That much is clear from the structure of Section 7, which starts by saying what the term "'electronic fund transfer' *means*" and what it "*includes*," before going on to say, in a list of five enumerated exceptions, what that same "term *does not include*."  15 U.S.C. § 1693a(7)(A)-(E) (emphasis added).  Courts routinely recognize that this type of structure and language about what a statutory term "does not include" denotes an "exception" from a preceding statutory definition.  As the Supreme Court put it in describing a similarly structured statute, "[t]he body of [the statute] establishes a general definition of the term …, and the phrase 'does not include' takes out of that broad definition" subsets of the more broadly defined class.  *Arkansas Best Corp. v. C.I.R.*, 485 U.S. 212, 217-218 (1988)); *see also Vukmirovic v. Ashcroft*, 362 F.3d 1247, 1251 (9th Cir. 2004) (describing "does not include" provision as an "exception").  This foundational principle of statutory drafting is critical to understanding the Section 7(B) exemption and its role in Section 7.

Section 7 uses a particular phrase—"transfer of funds"—to specify the intended subject of the term "electronic fund transfer," defining that term to mean "any *transfer of funds* … initiated through an electronic terminal … so as to order, instruct, or authorize a financial institution to debit

or credit an account." 15 U.S.C. § 1693a(7) (emphasis added). A second phrase in that definition is also important. The "transfer of funds" *begins* with the order or instruction "to *debit* or credit *an account*." *Id.* (emphasis added). That is, after all, what happens in "point-of-sale transfers, automated teller machine transactions," and the other types of fund transfers that Congress specifically listed in Section 7. *Id.* There is an instruction to debit the account and transfer those funds in various manners over networks. Sections 7(A) through 7(E) then carve out exceptions to the statute's general definition, describing particular transfers or transactions that the statutory term "electronic fund transfer" "does not include." *Id.* For example, Section 7(C)—not at issue here—carves out any transaction in Section 7 if "the primary purpose … is the purchase or sale of securities or commodities through a broker-dealer registered with or regulated by the Securities and Exchange Commission." *Id.* § 1693a(7)(c).

The Section 7(B) wire-transfer exemption uses the exact same phrase as Section 7—"transfer of funds"—to describe a particular form of consumer-initiated transfer that EFTA's definition of "electronic fund transfer" "does not include." 15 U.S.C. § 1693a(7)(B). Congress's choice of words is important. "A standard principle of statutory construction is that identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007); *see also Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("[T]here is a presumption that a given term is used to mean the same thing throughout a statute."). Here, the commonality of language between Sections 7 and 7(B) makes clear that Section 7(B) refers to the same types of transfers ("transfer of funds") as Section 7 itself—*i.e.*, those initiated electronically that instruct a financial institution *to debit an account*. Section 7(B) then carves out from the definition of "electronic fund transfer" the subset of those "transfer[s] of funds" that are sent "by means of" a wire transfer service. Congress's choice of words shows that it deliberately chose to exclude a consumer-originated electronic fund transfer carried out through a wire-transfer service—including the initial "debit" of the "account" as part of that wire transfer.

Section 7(B)'s text further confirms this interpretation, stating that the exception applies specifically to "any transfer of funds" that is "made by a financial institution *on behalf of a consumer*." 15 U.S.C. § 1693a(7)(B) (emphasis added). Read together with Section 7, this

language makes unmistakably clear that the exempted funds transfer begins when a *consumer* "initiate[s the transaction] through an electronic terminal" and "instruct[s] a financial institution to debit" their "account." *Id.* § 1693a(7). The text is thus consistent with the ordinary understanding of a wire transfer—the transfer a financial institution makes on behalf of a consumer, Person A, to make payment to Person B, starting with a debit of Person A's account.

This understanding has long been settled. It was captured not only in the text of Sections 7 and 7(B), but also in Regulation E—which implements EFTA—and in Article 4A, which was developed following EFTA's enactment to comprehensively govern wire transfers, including those exempted from the electronic fund transfers covered by EFTA. Regulation E, for example, states that Section 7(B)'s exclusion applies to "Wire or other similar transfers," and describes the sorts of transfers conducted via "Fedwire or through a similar wire transfer system that is used primarily for transfers between financial institutions or between businesses." 12 C.F.R. § 1005.3(c)(3); *see also* 44 Fed. Reg. at 18,468, 18,471 ("clarify[ing] that transfers for consumers by any network similar to Fedwire (that is used primarily for financial institutions or business transfers) are exempt"). Just as importantly, Article 4A conceives of a singular "funds transfer" as a "*series of transactions*, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order." Cal. Com. Code § 11104(a) (emphasis added). Given EFTA's text, Regulation E, and Article 4A, it is impossible to interpret Section 7(B) as exempting only the interbank segment of a wire transfer. Rather, the common understanding of a wire transfer includes the series of transactions comprising its whole, including the original deduction of money from the sender's account. The contrary theory underlying the Amended Complaint—that Section 7(B) exempts only those interbank steps that occur after the money is deducted from the sender's account—finds no support in the plain, long-understood meaning of the statutory text.

**B.    Statutory Context Confirms EFTA Does Not Apply To The Transactions Here**

There are additional contextual reasons, beyond the plain text of EFTA, that Section 7(B) must be read to cover the entire wire transfer rather than solely the interbank segment. Under Plaintiffs' theory, Section 7(B) would be entirely superfluous. The canon against surplusage directs courts to prefer an "interpretation [that] gives effect to every clause and word of a statute."

*Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013); *see also United States v. Mariner Health Care, Inc.*, 552 F. Supp. 3d 938, 953 (N.D. Cal. 2021) ("[T]he canon against surplusage … advises that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009))).  That canon has special force in this case:  "When a statutory construction … 'render[s] *an entire subparagraph* meaningless,' … the canon against surplusage applies with special force," and "still more when the subparagraph is so evidently designed to serve a concrete function."  *Pulsifer v. United States*, 601 U.S. 124, 143 (2024) (emphasis added) (quoting *Nat'l Assn. of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128 (2018)).

Here, Plaintiffs' reading of Section 7(B) would do just that—render Section 7(B) entirely meaningless.  To understand why, it is important to recognize how Section 7(B) works.  It is not a general exception to the statute.  Rather, it is an exception specifically to the definition of "electronic fund transfer."  The problem with Plaintiffs' reading, under which Section 7(B) exempts only a transfer of funds between banks, is that such a transfer could never be an "electronic fund transfer" in the first place.  Section 7 applies only to transfers that electronically initiate a debit from (or credit to) an "account," a statutorily defined term.  Section 1693a(2) defines "account" to include only those accounts "established primarily for personal, family, or household purposes"—*i.e.*, consumer accounts.  The interbank segment of a wire transfer does not initiate a debit from (or a credit to) any *consumer* account; rather, the interbank segment credits and debits only *banks*' accounts.  Under Plaintiffs' interpretation then, Section 7(B) exempts a transfer of funds that is already beyond Section 7's reach—and plainly so.  The Supreme Court has rejected attempts like this to interpret statutory exceptions as "do[ing] nothing but stat[ing] the obvious" or to construe an exemption such that it "does not in fact exempt anyone from anything to which they would otherwise be subject."  *Sturgeon v. Frost*, 587 U.S. 28, 50-51 (2019).  It would make no sense for Congress to legislate in Section 7(B) that an interbank transfer is not an "electronic fund transfer," given that the definition of that term already excludes purely interbank transfers.  Rather, the only need for the exemption would be to exempt the full wire transfer, *including* the *consumer's* payment order instructing a financial institution to debit the *consumer's* account.

This understanding is confirmed by the way EFTA works. The statute provides consumers with procedural mechanisms to seek relief when something goes awry with a covered "electronic fund transfer." But consumers have no interest in—and would never be expected to present disputes to their financial institutions about—the purely behind-the-scenes process banks use to transfer funds amongst themselves. What matters to the consumer, and thus what consumers would be expected to dispute and request investigations of, is the wire transfer as ordinarily understood: whether the deduction of money from the consumer's account was authorized and whether the correct amount of money made it to the intended payee. The supposition that Congress could have believed it needed to protect financial institutions from consumer disputes about solely interbank transfers—necessitating an exemption narrowly targeted to those interbank transfers alone—is simply not credible. Indeed, in the history of this case, Plaintiffs have never explained what Congress possibly could have intended to achieve through such a narrow exemption.

Further proof that Section 7(B) cannot possibly bear that meaning lies in the exception to the exemption found within Section 7(B) for transfers "processed by automated clearinghouse" (*i.e.*, ACH). 15 U.S.C. § 1693a(7)(B). If the purpose of Section 7(B) was simply to clarify that consumers cannot raise disputes about the interbank segment of a wire transfer, then why would Congress go on to preserve a consumer's right to challenge the interbank segment of an ACH transfer? There is no reason. That proviso in Section 7(B) for ACH transfers only makes sense when Section 7(B)'s use of the phrase "any transfer of funds" is read to refer to the entire transfer (*i.e.*, the wire or ACH transfer), end to end. The wire-transfer exemption means that a wire transfer is *not* an "electronic fund transfer." The ACH proviso means that notwithstanding Section 7(B)'s general language, an ACH transfer *is* an "electronic fund transfer." The reason for the ACH proviso is that Congress wanted to preserve a consumer's right to use EFTA's protections and remedies for end-to-end transfers that travel via ACH, inclusive of the order instructing a bank to deduct money from the consumer's account. This is consistent with the legislative history, which made clear that EFTA was intended to apply to "automated clearing house transactions through which a consumer's account is automatically debited for a recurring payment, like insurance premiums, or is regularly credited with wages, pension benefits, and the like." S. Rep. No. 95-

915, at 3.

"It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).  Here, that statutory context confirms what the text already makes plain:  the Section 7(B) exemption applies to the full series of transactions comprising a wire transfer end to end, including the payment order instructing the financial institution to deduct money from the consumer's account.

**C.     Extensive Case Law Holds EFTA Does Not Apply To The Transactions Here**

What is evident from EFTA's text and context is confirmed by mountains of case law reaching the same conclusion:  that by operation of Section 7(B), EFTA does not apply to wire transfers, end to end.

To start, courts in this district and other districts within the Ninth Circuit have recognized this conclusion as settled and uncontroversial.  In *Bakhtiari v. Comerica Bank, Inc.*, the court considered a case in which the plaintiffs were duped into making two wire transfers "to pay someone who turned out to be a scam artist."  2024 WL 3405340, at *1 (N.D. Cal. July 12, 2024).  The court dismissed the plaintiffs' claims under EFTA because "the wire transfers in question are not covered under EFTA."  *Id.*   There, as here, the plaintiffs "not only characterize that they engaged in a 'wire transfer' … but also allege the transfer of funds took place between defendant, a financial institution, and a beneficiary bank," so the court found that the transfers were wire transfers and accordingly exempt entirely from EFTA.  *Compare id. with*, *e.g.*, AC ¶¶ 9, 12, 72.  Other district courts in the Ninth Circuit similarly have held that EFTA does not apply to wire transfers, period.  *See McClellon v. Bank of Am., N.A.*, 2018 WL 4852628 (W.D. Wash. Oct. 5, 2018) (rejecting application of EFTA and Regulation E to unauthorized wire transfer); *Kanji v. Bank of Am., N.A.*, 2020 WL 8175548, at *3 (C.D. Cal. Aug. 25, 2020) ("Notably, the EFTA does not apply to wire transfers.").

This straightforward conclusion abounds in the precedent of federal courts outside the Ninth Circuit too.  The Sixth Circuit, relying in part on support from the Fourth and Eleventh Circuits, held that when "funds transfers at issue were made through Fedwire, . . . EFTA does not

apply." *Wright v. Citizen's Bank of E. Tenn.*, 640 F. App'x 401, 404 (6th Cir. 2016) (citing *Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267, 1274 (11th Cir. 2003); *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 223 (4th Cir. 2002)).    Numerous other courts have reached the same conclusion.  *See Nazimuddin v. Wells Fargo Bank N.A.*, 2024 WL 3431347, at \*2 (S.D. Tex. June 24, 2024) (dismissing EFTA claim with prejudice "[b]ecause Regulation E excludes '[w]ire or other similar transfers' from the definition of 'electronic fund transfer,' [so] the EFTA does not apply to the wire transfers of which Plaintiff complains"), *report and recommendation adopted*, 2024 WL 3559597 (S.D. Tex. July 25, 2024), *aff'd* 2025 WL 33471 (5th Cir. Jan. 6, 2025); *Fischer & Mandell LLP v. Citibank, N.A.*, 2009 WL 1767621, at \*3-4 (S.D.N.Y. June 22, 2009) ("Regulation E explicitly excludes from the coverage of the EFTA transfers of funds made through checks and wire transfers."); *Trivedi v. Wells Fargo Bank, N.A.*, 609 F. Supp. 3d 628, 633 (N.D. Ill. 2022) (Article 4A, not EFTA, governed wire transfers); *Bodley v. Clark*, 2012 WL 3042175, at \*4 (S.D.N.Y. July 23, 2012) ("[W]ire transfers are explicitly excluded from EFTA's definition of 'electronic fund transfers[.]'").

Indeed, courts have rejected the very theory Plaintiffs rely on here, in which litigants attempt to parse a single wire transfer and thereby render the Section 7(B) exemption applicable to only the interbank segment.  In *Pope v. Wells Fargo Bank, N.A.*, the plaintiff made the same argument on which Plaintiffs rely here: that "there were two transfers[, o]ne initiated by her … and another by Wells Fargo to JP Morgan Chase." 2023 WL 9604555, at \*3 (D. Utah Dec. 27, 2023).  But the court held that "[t]he language of EFTA and the regulations support Wells Fargo's position" and "[t]he fact that there were 'two transfers' … do[es] not allow the wire transfer here to fall with[in] EFTA." *Id.* at \*3-4.  Similarly, in *Stepakoff v. IberiaBank Corp.*, a plaintiff brought an EFTA claim challenging her bank's failure to execute a wire transfer she directed (both by phone and via email).  637 F. Supp. 3d 1309, 1311 (S.D. Fla. 2022).  In that case, the only transaction at issue was the electronic payment order the plaintiff gave her bank, and not any interbank transfer, because her bank never executed the initial order.  *Id.*  Nevertheless, the court held that the plaintiff failed to state a claim because Section 7(B) exempted from EFTA's coverage the wire transfer at issue.  *Id.* at 1313.  In other words, *Stepakoff* necessarily concluded that the

initial payment order—the only "transfer" even conceivably at issue in that case—was "specifically exclude[d] … from EFTA coverage" because it was a "'[w]ire or other similar transfer[].'" *Id.* at 1312.

Despite packing their Amended Complaint with legal argument and conclusions—which the Court need not accept as true on a motion to dismiss, *see Iqbal*, 556 U.S. at 678—Plaintiffs cite only the recent outlier decision by the Southern District of New York in *New York v. Citibank, N.A.*, to support the novel theory that EFTA exempts only the purely interbank segment of a wire transfer. That decision is not binding on this Court and any persuasive value it might otherwise carry is doubly undermined by (1) overwhelming contrary case law, including the decisions set out above, and (2) the fact that the *Citibank* court certified its order for interlocutory review. For all the reasons set forth above concerning EFTA's text, *see supra* Parts I.A, I.B, the *Citibank* decision is also wrong. That decision, vulnerable to reversal on appeal, does not support upending the settled view of EFTA's scope in this and numerous other judicial districts.[1]

### D.    Regulatory Guidance Confirms EFTA Does Not Apply Here

If statutory text, context, and uniform case law were not enough, the government entities charged with regulating the financial industry, including the two agencies that have been charged with interpreting EFTA (the CFPB and Federal Reserve), also agree that EFTA does not apply to wire transfers like the ones at issue here.

Start with the Consumer Financial Protection Bureau, which since the Dodd-Frank Act has been charged with interpreting EFTA. When, more than a decade ago, the CFPB implemented certain Dodd-Frank Act amendments to EFTA regarding cross-border remittance transfers, the Bureau stated the then-universally-accepted view that "until the Dodd-Frank Act [remittance] provisions become effective, *wire transfers are entirely exempt from the EFTA and Regulation E* and instead are governed by State law through State enactment of Article 4A of the U[CC]," which provides "[c]onsumers" with protections "in connection with an unauthorized [wire] transfer,"

---

[1] At least one district court has followed the erroneous reasoning of the *Citibank* court, but did so without being presented with, and thus, without considering "arguments for why [it] should reject the legal reasoning and holding in *Citibank*," like those advanced here. *Walling by Walling v. Bank of Am., N.A.*, 782 F. Supp. 3d 280, 285 (D.S.C. 2025).

including "improperly executed payment orders." *Electronic Fund Transfers (Regulation E)*, 77 Fed. Reg. 6,194, 6,211-6,212 (Feb. 7, 2012) (emphasis added). Just as importantly, the CFPB recognized that, due to U.C.C. § 4A-108 (which provides that Article 4A does not apply to a transfer "any part of which" is governed by EFTA, *supra* p.6), the *new* application of EFTA to remittance transfers sent by wire would *now* mean that Article 4A "will no longer apply" to those wire transfers. 77 Fed. Reg. at 6,211. Moreover, despite initially supporting the New York Attorney General in *Citibank*, the CFPB most recently disclaimed that support, recognizing that its statement of interest was "inappropriate" and explaining that the New York Attorney General's theory—identical to Plaintiffs' theory here—"advances an interpretation of [EFTA] that has never been embraced by any federal court prior to [the S.D.N.Y. decision]," nor "articulated by the [CFPB] or the Federal Reserve, which administered Regulation E before that responsibility was transferred to the [CFPB]," CFPB Mot. to Withdraw at 1, *Citibank*, No. 24-cv-659 (Mar. 25, 2025), Dkt. 69.

Before the CFPB, Congress charged the Federal Reserve with implementing EFTA. The Federal Reserve's positions during that period made clear its view that EFTA did not apply to wire transfers, including transfers from consumer accounts. In 1990, for example the Federal Reserve issued official commentary to its Regulation J stating that "Fedwire funds transfers *to or from consumer accounts* are exempt from the Electronic Fund Transfer Act and Regulation E." 12 C.F.R. pt. 210, Subpt. B, App. A (Comment 210.25(b)(4)) (emphasis added). The Board cannot have meant anything other than that an end-to-end wire transfer is entirely exempt from EFTA; a Fedwire funds transfer cannot be sent directly "to or from consumer accounts" because the Federal Reserve Banks do not hold accounts for consumers. The Federal Reserve has adhered to this view, stating in its *Consumer Compliance Handbook* that "any transfer of funds for a consumer within a system that is used primarily to transfer funds between financial institutions or businesses, e.g., Fedwire or other similar network" is not "covered by the EFTA and Regulation E." Fed. Rsrv. Bd., *Consumer Compliance Handbook* 85 (2016), https://tinyurl.com/3wfwdsma.

The pronouncements of other banking regulators are the same. The Federal Deposit Insurance Corporation instructs its examiners that "[a]ny transfer of funds for a consumer within

a system that is used primarily to transfer funds between financial institutions or businesses, *e.g.*, Fedwire or other similar network" is excluded from EFTA. FDIC, *Consumer Compliance Examination Manual* 809 (2022), https://tinyurl.com/3c9refbt. That instruction reiterates FDIC interpretive guidance—issued more than 30 years ago—that consumer-initiated wires are excluded from EFTA and Regulation E. *Users' Rights Under EFTA in the Event of Bank Error Regarding an Electronic Wire Transfer*, FDIC-94-21, 1994 WL 393720, at *1 (FDIC, Apr. 26, 1994) (Interpretive Letter). The Office of the Comptroller of the Currency's position is the same, having stated—recently—that "[w]ire transactions are covered under [Article] 4A of the Uniform Commercial Code." *Message from the Director–Wire Transfer Scams and Ways to Protect Yourself*, OCC (July 2023), https://tinyurl.com/38pc7bxu. The OCC likewise agrees that "a wire transfer transaction begins when the originator (bank customer) requests the transfer. The originating bank verifies the request then initiates the transaction with the operator (*e.g.*, Federal Reserve Bank or TCH). The beneficiary bank then credits the beneficiary account in accordance with the payment instructions." OCC, *Comptroller's Handbook: Payment Systems* 10-11 & Fig. 3 (v. 1.0, Oct. 2021), https://tinyurl.com/yn8c288b.

The Financial Crimes Enforcement Network ("FinCEN") also agrees that wire transfers—end to end—are not covered by EFTA. *See Definitions of Transmittal of Funds and Funds Transfer*, 78 Fed. Reg. 72,813, 72,814 (Dec. 4, 2013) ("Wire or other similar transfers conducted through Fedwire … or similar wire transfer systems primarily used for transfers between financial institutions or between business are also specifically excluded from the definition of 'electronic fund transfer.'"). And FinCEN agrees that a funds transfer is "a series of payment instruction messages, beginning with the originator's (sending customer's) instructions, and including a series of further instructions between the participating institutions, with the purpose of making payment to the beneficiary (receiving customer)." U.S. Dep't of Treasury, FinCEN, *Feasibility of a Cross-Border Electronic Funds Transfer Reporting System Under the Bank Secrecy Act* 55 (Oct. 2006), https://tinyurl.com/krh9thxp.

Finally, even consumer groups have recognized that consumer wire transfers are exempt from EFTA. For example, in February 2024, the Senate held hearings at which consumer

advocates, including a senior attorney for the National Consumer Law Center, urged Congress to close what they called EFTA's "wire transfer loophole," and stated their understanding that, under EFTA, even "completely unauthorized wire transfer[s]" were not subject to "protection under Regulation E." *Examining Scams and Fraud in the Banking System and Their Impact on Consumers* Before the S. Comm. Banking, Hous., & Urban Affairs at 20, 22 (Feb. 1, 2024) , https://tinyurl.com/5n97yaw8 (testimony of Carla Sanchez-Adams).  The National Consumer Law Center similarly observed two years earlier that "wire transfers are exempt from the EFTA" and are instead "covered under state law by UCC Article 4A." *What's in Your Digital Wallet?: A Review of Recent Trends in Mobile Banking and Payments*, Hybrid Hearing Before The Task Force on Fin. Tech. of the H. Comm. on Fin. Servs., 117th Cong. (2022) at 82, https://tinyurl.com/297kxs6b.

Though their Amended Complaint is filled with legal argument, Plaintiffs fail to identify any regulatory guidance that supports their novel re-interpretation of Section 7(B)'s long-settled exemption of wire transfers—end-to-end—from EFTA.

### E.    Plaintiffs' Interpretation Threatens Significant Uncertainty And Instability For Wire Transfers

As explained in detail by amici in the *Citibank* appeal, the erroneous interpretation advanced by Plaintiffs here would create significant uncertainty in the regulatory regime governing wire transfers, displacing predictable rules allocating the rights and responsibilities for all participants in wire transfers—including consumers that send and receive them.  *See* Br. for Amici Curiae Clearing House Ass'n, et al., *Citibank¸* No. 25-2105 (Nov. 17, 2025), Dkt. 33.  That is because, as explained above, Plaintiffs' interpretation would mean that EFTA governs "part" of a wire transfer, displacing Article 4A as to every part of that transfer, including Article 4A's rules that provide protections for consumers that send and receive wire transfers.  *Supra* p.6.  The two principal wire transfer systems—the Fedwire Funds Service and the CHIPS network—rely on the statutory backing of Article 4A to ensure that rules governing wire transfers extend beyond the financial institutions that are bound by those systems' rules and regulations, to the end-users of wire transfers too.  Those Article 4A rules include, but are not limited to, protections for consumers like discharging a consumer payor's payment obligations once the intended recipient's bank

accepts the payment order, requiring that a consumer beneficiary of a wire transfer be paid by her bank, and excusing a consumer wire transferor's obligation to pay for the wire transfer if her bank does not complete the transfer.  *Supra* pp.5-6 (citing Cal. Com. Code §§ 11402(c), 11404, 11406); *see also* Br. for Amici Curiae Clearing House Ass'n, et al. at 10-11, 22-23, *Citibank*, No. 25-2105. In this way, Plaintiffs' interpretation would undermine the very foundation of the decades-long, comprehensive regime governing funds transfers.  Moreover, Plaintiffs' strained reading of EFTA to apply to one small part of a wire transfer would deprive consumers and others of additional protections in the wire transfer context.

Given EFTA's plain text, the context in which the Section7(B) wire-transfer exemption exists within EFTA, the overwhelming judicial and regulatory rejection of Plaintiffs' position and the principles on which it rests, and the threat to the stability of wire-transfer regulation as a whole posed by Plaintiffs' interpretation, the Court should dismiss the Amended Complaint with prejudice.

## II.   Plaintiffs Fail To Plausibly Allege An "Unauthorized Transfer"

Even if EFTA applied here—it does not, for the reasons above—Plaintiffs' EFTA claims fail because Plaintiffs still have not plausibly alleged that the two transfers at issue were "unauthorized," as that term is used in EFTA.  The statute defines an "unauthorized electronic fund transfer" as "an electronic fund transfer from a consumer's account initiated by a person *other than the consumer* without actual authority to initiate such transfer and from which the consumer receives no benefit."  15 U.S.C. § 1693a(12) (emphasis added).

The Amended Complaint tries to allege facts supporting the conclusion that a third party—the alleged fraudster—initiated the transfers at issue.  But even in doing so, the Amended Complaint immediately undercuts its own allegations, rendering implausible the assertion that a third party initiated the transactions, as opposed to Mr. Chen himself after falling for a scam.  The theory of the Amended Complaint is that a fraudster allegedly "gained access to Mr. Chen's iPhone through [a] FaceTime call using Apple's 'remote control' feature."  AC ¶ 38.  But the Amended Complaint then alleges that Mr. Chen "does not recall allowing remote access to his phone," and instead believes he merely "shared his screen with the caller."  *Id.* ¶¶ 39-40.  The Amended

Complaint does not explain how it is possible for the fraudster to "take over" the iPhone without Mr. Chen granting the fraudster permission to access the phone, something he denies he did. The Amended Complaint speculates that the fraudster acted through "Apple's 'remote control' feature," *id.* ¶ 38, but that feature requires a FaceTime user to grant permission before a third-party can access their device. *See Request or give remote control in a FaceTime Call on iPhone*, Apple, https://tinyurl.com/y9wp99d9 (last visited Dec. 19, 2025). Moreover, while Plaintiffs now allege that they told Bank of America that they "did not … press any buttons to effectuate any transfers, or respond to any text messages to confirm any account activity," AC ¶ 58, the Amended Complaint conspicuously stops short of alleging that the Plaintiffs in fact took no such actions.[2] Instead, the Amended Complaint continues to allege in vague, legal conclusions that Plaintiffs did not "perform[]" or "authorize[]" the transactions, *id.* ¶¶ 44-45. As before, it is not clear that a consumer—rather than her financial institution—ever "performs" a wire transfer, so the allegation that Plaintiffs did not "perform" these transfers does nothing to support their claims. And allegations that a "transfer was 'unauthorized,' without further factual support, … are 'legal conclusions, couched as facts, and are not sufficient under *Twombly* and *Iqbal* to state a claim.'" *Guarnieri v. Be Money Inc.*, 2022 WL 11381916, at \*5 (C.D. Cal. Oct. 18, 2022) (quoting *Gilbert v. Bank of Am., N.A.*, 2014 WL 12644029, at \*3 (N.D. Cal. Sept. 23, 2014)) (cleaned up).

Even on a motion to dismiss, courts need not "parse a distinction between … contradictory allegations or speculate as to which of them plaintiff would prefer the court to accept as true." *Napear v. Bonneville Int'l Corp.*, 669 F. Supp. 3d 948, 964 (E.D. Cal. 2023). Rather, "where the allegations contradict each other, very little can be inferred factually to supply the essential elements of [a] claim." *Anderson v. Virga*, 2017 WL 1179142, at \*3 (E.D. Cal. Mar. 29, 2017). Here, Plaintiffs allege *both* that Mr. Chen did not give the fraudster remote access to his phone, instead merely sharing his screen with the fraudster, *and* that the fraudster nevertheless accessed his phone using a feature that requires permission from the FaceTime user before granting access.

---

[2] Plaintiffs also allege they told Bank of America "that they did not … respond to any text messages to confirm any account activity," AC ¶ 58, even though they also allege that Mr. Chen repeatedly responded to text messages he believed to be seeking confirmation of account activity, *id.* ¶¶ 29-32.

The Court need not ignore the "obvious alternative explanation," *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007)), that the fraudster simply persuaded Mr. Chen to send the transfers himself.[3]

It is unfortunate that Plaintiffs may have been the victims of a scam. But if they were induced by a fraudster to initiate the transfers, then the law is explicit that the transfers are not "unauthorized" under EFTA. *See, e.g.*, *Tristan v. Bank of Am.*, 2023 WL 4417271, at *10 (C.D. Cal. June 28, 2023) (dismissing EFTA claim where plaintiff initiated transfers at third party's request); *Sanchez v. Navy Fed. Credit Union*, 2023 WL 6370235, at *22-23 (C.D. Cal. Aug. 14, 2023) (same).

The failure to allege facts supporting the assertion that the transfers were unauthorized is facially fatal to Plaintiffs' Count One claim, seeking liability "for unauthorized transfers." AC ¶ 109. It is also fatal to their Count Two claim, which seeks to impose liability under 15 U.S.C. § 1693f and corresponding regulations for failing to investigate the transfers at issue. Having failed "to identify any actual 'error' with how Defendant treated [their] … transactions under the EFTA"—that is, having failed to plausibly allege the transactions were "unauthorized"—Plaintiffs "also cannot maintain a cause of action based on Defendant's failure to conduct a reasonable investigation into [their] claim." *Sanchez*, 2023 WL 6370235, at *24.

Moreover, Plaintiffs' claim that Defendant failed to investigate properly is belied by their own allegations. Regulation E provides that the Bank's "review of its own records regarding an alleged error" satisfies § 1693f when the error "concerns a transfer to or from a third party" and "there is no agreement between the institution and the third party for the type of electronic fund

---

[3] Plaintiffs' "remote control" theory suffers from significant additional problems, including that Apple's "remote control" feature only works if the party requesting access is saved in the device owner's contacts. *See Request or give remote control in a FaceTime call on iPhone*, Apple https://tinyurl.com/y9wp99d9 (last visited Dec. 19, 2025). And the "remote control" feature is available only on iOS 18 or later, an operating system released on September 16, 2024—the same day the alleged transactions took place. *See iOS 18 is available today, making iPhone more personal and capable than ever*, Apple (Sept. 16, 2024), https://tinyurl.com/mwpv453d. The Amended Complaint does not allege that the unknown, unidentified fraudster was saved in Mr. Chen's contacts nor that Mr. Chen happened to update his phone to the new operating system the very same day in question, before the interaction with the fraudster.

transfer involved." *Tristan*, 2023 WL 4417271, at \*9 (quoting 12 C.F.R. § 205.11(c)). Plaintiffs' allegations show that Defendant did investigate their claim and determined that "the transaction in question was performed by an authorized signer on the account," "using a device that is consistent with previous valid account activity." AC ¶ 60. The Bank's decision was based "on [its own] records and the information [Plaintiffs] provided when [Plaintiffs] contacted" the Bank. *Id*. Because Plaintiffs themselves allege that the Bank investigated, reviewed its records, and notified Plaintiffs of the result, Plaintiffs' Section 1693f claim should be dismissed. *See Tristan*, 2023 WL 4417271, at \*10 (dismissing Section 1693f claim based on an analogous investigation into an alleged error).

## III.    Dismissal Should Be With Prejudice

Dismissal without leave to amend is appropriate where "[f]urther amendment would simply be a futile exercise." *Parents for Privacy v. Barr*, 949 F.3d 1210, 1239 (9th Cir. 2020). When a "Plaintiff['s] legal theories fail," regardless of any deficiencies in their factual allegations, that standard is met. *Id.* Here, the Amended Complaint is legally deficient because it depends on the erroneous legal position that EFTA governs the transactions at issue. Because EFTA does not apply, no additional allegations could cure this deficiency, and amendment would be futile. The Amended Complaint should accordingly be dismissed with prejudice.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss the Amended Complaint with prejudice.

Respectfully submitted,

Dated: December 19, 2025

WILMER CUTLER PICKERING HALE
AND DORR LLP

By:    */s/ Noah Levine*
          Noah Levine

*Counsel for Defendant Bank of America, N.A.*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2025, a true and correct copy of the foregoing Motion To Dismiss was served by CM/ECF to the parties registered to the Court's CM/ECF system.

Dated: December 19, 2025                    By:    */s/ Noah Levine*

                                                   Noah Levine