Andrew Guzzo (*pro hac vice*)
J. Patrick McNichol (*pro hac vice*)
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
aguzzo@kellyguzzo.com
pat@kellyguzzo.com

Varshini Parthasarathy (SBN 350769)
GUPTA WESSLER LLP
235 Montgomery Street, Suite 629
San Francisco, CA 94104
Telephone: (415) 573-0336
varshini@guptawessler.com

*Counsel for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

Ricky H. Chen and Amin Wu, *individually and as representatives of the class*,

*Plaintiffs,*

v.

Bank of America, N.A.,

*Defendant.*

Case No. 3:25-cv-3790-EMC

**PLAINTIFFS' REQUEST FOR LEAVE TO FILE STATEMENT OF RECENT DECISION UNDER LOCAL RULE 7-3(d)(2)**

Hon. Edward M. Chen
Courtroom 5, 17th Floor

Plaintiffs Ricky H. Chen and Amin Wu, by and through their counsel, respectfully request leave to file a Statement of Recent Decision under Local Rule 7-3(d)(2). That rule states that, with certain exceptions, once a reply is filed in connection with a pending motion, no additional memoranda, papers or letters may be filed without prior Court approval. Subpart (2) to Rule 7-3(d) permits a party, after a reply has been filed, to file a Statement of Recent Decision to bring to the Court's attention a relevant judicial opinion. That must be done before the noticed hearing date unless the Court grants prior approval.

After the hearing on Defendant Bank of America's motion to dismiss was held on March 12, 2026, Judge Jill N. Parrish, in *Nelson v. Wells Fargo Bank, N.A.*, No. 2:25-CV-01106-JNP-DAO, 2026 WL 2797345 (D. Utah Sept. 18, 2026), issued an order rejecting virtually the same arguments as those made in Bank of America here. Accordingly, Plaintiffs request approval from the Court to file a Statement of Recent Decision under Local Rule 7-3(d)(2).

September 23, 2026

Respectfully submitted,

*/s/ Varshini Parthasarathy*
Varshini Parthasarathy (SBN 350769)
GUPTA WESSLER LLP
235 Montgomery Street, Suite 629
San Francisco, CA 94104
Telephone: (415) 573-0336
*varshini@guptawessler.com*

Andrew Guzzo (*pro hac vice*)
J. Patrick McNichol (*pro hac vice*)
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
*aguzzo@kellyguzzo.com*
*pat@kellyguzzo.com*

*Counsel for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 23, 2026, a true and correct copy of the foregoing document(s) was served by CM/ECF to all parties registered with the Court's CM/ECF system.

*/s/ Varshini Parthasarathy*
Varshini Parthasarathy

*Counsel for Plaintiffs and the Proposed Class*

2026 WL 2797345
Only the Westlaw citation is currently available.
United States District Court, D. Utah.

MARK NELSON and SARAH NELSON Plaintiffs,
v.
WELLS FARGO BANK, N.A., Defendant.

Case No. 2:25-cv-01106-JNP-DAO
|
Filed 09/18/2026

**Attorneys and Law Firms**

Amberly Page, Sam Meziani, Goebel Anderson PC, Salt Lake City, UT, for Plaintiffs.

Amy F. Sorenson, Paul W. Shakespear, Tanya Kaye Noreen Lewis, Snell & Wilmer LLP, Salt Lake City, UT, for Defendant.

Magistrate Judge Daphne A. Oberg

MEMORANDUM DECISION AND ORDER DENYING IN PART AND GRANTING MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Jill N. Parrish Chief United States District Court Judge District of Utah

***1** Defendant Wells Fargo Bank, N.A., moves to dismiss Mark and Sarah Nelson's complaint alleging violations of the Electronic Fund Transfer Act and Utah's Uniform Commercial Code ("UCC"), negligence, breach of contract, and breach of the implied covenant of good faith and fair dealing. *See* ECF Nos. 21, 22, 25. For the reasons discussed below, the motion is DENIED in part and GRANTED in part.

## BACKGROUND [1]

Mark and Sarah Nelson hold a consumer checking account with Wells Fargo. ECF No. 1 ¶ 5. Wells Fargo allows customers to access consumer checking accounts and initiate wire transfers from those accounts using Wells Fargo's online banking platform. *Id.* at ¶ 6. At some point during or before April 2025, an unknown actor gained access to the Nelsons' consumer checking account, as well as Mark Nelson's Verizon telephone account. *Id.* at ¶ 8. This unknown actor used Wells Fargo's online banking platform to initiate three transactions moving funds out of the Nelsons' checking account. *Id.* at ¶ 11. Wells Fargo carried out these transactions, removing a total of $67,850.00 from the Nelsons' account between April 16 and 18, 2025. *Id.* at ¶¶ 13-14. The Nelsons notified Wells Fargo that the transactions were unauthorized via telephone on April 19, 2025, and in person on April 21, 2025. *Id.* at ¶ 20. Wells Fargo refuses to refund the transfers to the Nelsons' account. *Id.* at ¶¶ 22-23.

The Nelsons allege that each of these three transactions in fact consists of at least two constituent transfers. *Id.* at ¶ 51-53. Specifically, when a customer initiates a transaction sending funds to an individual at another bank using Wells Fargo's online banking platform, Wells Fargo first conducts an intra-bank electronic fund transfer, which debits the customer's account and credits the same amount to a pooled Wells Fargo account. *Id.* at ¶ 52. Only then does Wells Fargo conduct a wire transfer, which sends the funds from the pooled Wells Fargo account to the other bank using a wire service. *Id.*

## LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a court may dismiss a complaint if it fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). When considering a motion to dismiss for failure to state a claim, a court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013).

## DISCUSSION

***2** Wells Fargo asks this court to dismiss each of the causes of action pleaded by the Nelsons. ECF No. 21, p. 3. Though Wells Fargo does not appear to dispute the Nelsons' factual allegations, Wells Fargo argues that each of the Nelsons' claims fails as a matter of law. *Id.* at pp. 2-4.


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**I. ELECTRONIC FUND TRANSFER ACT**

Wells Fargo argues that the Electronic Fund Transfer Act ("EFTA") does not apply to wire transfers and that the Nelsons' EFTA claim is therefore barred as a matter of law. *Id*. at pp. 6-8. In support of this argument, Wells Fargo cites the language of the EFTA; the canon of ordinary meaning; the canon against surplusage; the whole-text canon; caselaw; and regulatory guidance. *Id*. at pp. 8-14.

*A. The EFTA*

The EFTA was enacted in 1978 following a report from the National Commission on Electronic Fund Transfers, which investigated, among other things, the need to protect the legal rights of consumers using electronic fund transfer systems. 1 DONALD I. BAKER, ET AL., THE LAW OF ELECTRONIC FUND TRANSFER SYSTEMS § 12.03 (2026). The EFTA's primary objective was to provide individual consumer rights in the context of electronic fund transfer systems. 15 U.C.S. § 1693. Although some provisions did not become effective until 18 months after the EFTA's enactment, two sections, governing consumer liability for unauthorized electronic fund transfers and unauthorized issuance of cards capable of initiating electronic fund transfers, were considered particularly important and therefore became effective approximately 90 days after enactment. 1 DONALD I. BAKER, ET AL., THE LAW OF ELECTRONIC FUND TRANSFER SYSTEMS § 12.03 (2026).

The Nelsons' claims implicate one of those provisions: 15 U.S.C. § 1693g, which limits a consumer's liability for an unauthorized electronic fund transfer involving his or her account to the lesser of $50 or the amount obtained in the transfer (with certain exceptions where consumers fail to promptly notify the bank of the unauthorized transfer). 15 U.S.C. § 1693g(a). This limitation of liability, like the rest of the EFTA, applies to electronic fund transfers but not to transfers of funds made by financial institutions on behalf of a consumer using services that: (a) transfer funds held at Federal Reserve banks or other depository institutions; (b) are not designed primarily to transfer funds on behalf of consumers; and (c) are not an automated clearinghouse. 15 U.S.C. § 1693a(7). This exclusion has been interpreted as exempting wire transfers from the scope of the EFTA. For example, Regulation E, promulgated pursuant to the EFTA, states that electronic fund transfer does not include "[w]ire or other similar transfers," meaning "[a]ny transfer of funds through Fedwire or through a similar wire transfer system that is used primarily for transfers between financial institutions or between businesses." 12 C.F.R. § 1005.3(c)(3). [2]

Wells Fargo argues that the April 2025 transactions are wire transfers and are therefore excluded from the EFTA's limits on consumer liability for unauthorized transfers. ECF No. 21, pp. 7-8. The Nelsons allege that the transfers were made up of at least two subparts: an initial electronic fund transfer from the Nelsons' consumer checking account to Wells Fargo's pooled account through Wells Fargo's internal system, and a subsequent wire transfer from Wells Fargo's pooled account to the other bank, carried out through the wire network. ECF No. 22, pp. 4-6. The first of these transfers, they contend, is within the scope of the EFTA. *Id.*

***3** Resolving this dispute requires the court to consider: (1) whether each of the April 2025 transactions should be understood as a single, unitary transfer or as a series of transfers; (2) if the transactions are understood as series of transfers, whether different liability regimes may apply to different transfers; and (3) if different liability regimes may apply, which transfer in the series is relevant to determining the Nelsons' and Wells Fargo's liabilities to each other.

*B. The Text of the EFTA*

The text of the EFTA supports the Nelsons' proposed interpretation. "[T]he authoritative statement is the statutory text[.]" *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005). The EFTA states that

> the term "electronic fund transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

15 U.S.C. § 1693a(7). However, Subsection 7(B) states that the term "electronic fund transfer" does not include

> any transfer of funds, other than those processed by automated clearinghouse, made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer[.]

15 U.S.C. § 1693a(7)(B).

1) Whether each of the April 2025 transactions should be understood as a single, unitary transfer or as a series of transfers

Wells Fargo argues that the term "transfer," as used in the EFTA, encompasses a "complete transfer of funds from the sender to the recipient, not merely behind-the-scenes discrete movements to make that ultimate transfer happen." ECF No. 21, p. 9. Under this approach, Wells Fargo says, Subsection 7(B) operates to exclude all transactions that include the transfer of funds via the wire system, even if the transaction also encompasses transfers that would, on their own, be considered electronic fund transfers covered by the EFTA. *Id.* The Nelsons respond that the transactions should be understood as series of individual transfers, including electronic fund transfers covered by the EFTA, even if the series of transfers also includes a wire transfer. ECF No. 22, pp. 2—3.

The text of the EFTA does not define "transfer" when defining electronic fund transfers or when exempting certain transfers under Subsection 7(B). "When a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). In identifying a term's ordinary meaning, we are directed to determine "the ordinary public meaning of [the statute's] terms at the time of its enactment." *Bostock v. Clayton Cnty.*, Georgia, 590 U.S. 644, 654 (2020). Wells Fargo hypothesizes that, "[i]n common speech, one would say that 'John wired $100 to Sue' " and would not "quibble" about the intermediary steps in such a transaction. ECF No. 21, p. 9. But this confuses the analysis; courts are instructed to determine a term's ordinary meaning, not how an ordinary American might discuss the law's subject matter in everyday conversation. [3]

***4** Approaching Subsection 7(B) with this in mind, the court does not find any indication that all of the transfers in a series that includes a wire transfer are excluded from the coverage of the EFTA. Indeed, Subsection 7(B) does not use the term "wire transfer," nor does it refer to specific start and end points from which a reader might infer the scale of a "transfer." Instead, Subsection 7(B) refers to "any transfer of funds ... made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer." 15 U.S.C. § 1693a(7)(B). Here, the reasoning of the District Court for the Southern District of New York is persuasive; "transfer," as used in Subsection 7(B), refers specifically to the movement of funds within a fund-transferring service (i.e., the wire network). *See* *New York by James v. Citibank, N.A.*, 763 F. Supp. 3d 496, 511 (S.D.N.Y. 2025). There is no indication that the ancillary transfers of funds within banks before or after the transfer described in Subsection 7(B) are included in Subsection 7(B). Nor is there any indication that a reader should conceptualize a transaction that includes a transfer within the meaning of Subsection 7(B) as a unitary whole such that those ancillary transfers are swept into Subsection 7(B)'s exemption.

Wells Fargo argues that the Supreme Court, in applying the doctrine of ordinary meaning, has encouraged courts to ask "how an ordinary American might approach the law's terms." *Feliciano v. Dep't of Transportation*, 605 U.S. 38, 45 (2025). But courts are not directed to defer to ordinary Americans' understanding of the underlying facts of a case. In applying the canon of ordinary meaning, Wells Fargo neatly sidesteps the likelihood that many Americans, when they discuss a consumer transaction that uses the wire system, do not know that they are actually discussing a series of transfers, only one of which uses the wire system. It is difficult to imagine that an ordinary American, having been informed that the April 2025 transactions in fact consisted of an initial transfer of funds from the Nelsons' account to the pooled Wells Fargo account, followed by a wire transfer from the pooled Wells Fargo account to another bank, would interpret Subsection 7(B) as applying to the initial transfer of funds. Returning

to the plain language of Subsection 7(B), the initial transfers were initiated by the Nelsons (or, in this case, a fraudulent actor pretending to be the Nelsons), not by Wells Fargo, so they were not "made by a financial institution on behalf of a consumer." 15 U.S.C. § 1693a(7)(B). Furthermore, the transfers within Wells Fargo were not accomplished by means of the wire system or any other system that transfers funds between financial institutions. 15 U.S.C. § 1693a(7)(B). If one is aware that an initial, intra-bank transfer occurred, it is extremely unintuitive to read Subsection 7(B) as applying to such a transfer.

Wells Fargo further argues that the term "transfer" must be interpreted to mean an end-to-end transaction because finding otherwise renders Subsection 7(B) superfluous. ECF No. 21, p. 11. Specifically, Wells Fargo suggests that Subsection 7(B) is surplusage if it refers only to bank-to-bank transfers, as the EFTA is already restricted to transfers crediting or debiting accounts established primarily for personal, family, or household purposes. 15 U.S.C. § 1693a(2). This argument falls short. First, under the Nelsons' interpretation, Subsection 7(B) still operates to remove the bank-to-bank wire transfer within the consumer-initiated transaction from the scope of the EFTA. This is consistent with the EFTA's focus on consumer protection, which is less relevant in the context of bank-to-bank transfers. Second, though courts aim to give effect to all provisions of a statute and avoid surplusage, the EFTA is not a model of brevity, as the District Court for the Southern District of New York also noted. *Citibank, N.A.*, 763 F. Supp. 3d at 514. The same definitions section in which Subsection 7(B) appears defines an "unauthorized electronic fund transfer" as a transfer "initiated by a person other than the consumer" and then provides a series of exclusions, including transfers initiated "with fraudulent intent by the consumer or any person acting in concert with the consumer." 15 U.S.C. § 1693a(12). The first part of this definition is clearly redundant, unless the phrase "person other than the consumer" includes "the consumer."

2) Whether different liability regimes may apply to different transfers in one transaction

***5** Having concluded that Subsection 7(B) refers only to the transfer within each transaction that was accomplished using the wire service, it is necessary to determine whether different rules might apply to different transfers within a transaction. It is clear that this must be the case. Subsection 7(B) clearly states that the wire transfers are not subject to the EFTA, but the electronic fund transfers that took place prior to each wire transfer remain squarely within the EFTA's definition of electronic fund transfers. 15 U.S.C. § 1693a(7).

Wells Fargo, rejecting this approach, appeals to the whole-text canon and suggests that the Nelsons' interpretation "could ultimately take away consumer protection rights" by placing some part of the transactions at issue outside of any existing regulatory scheme. ECF No. 21, p. 12. But Wells Fargo is unable to find support for this proposition within the whole text of the EFTA and therefore attempts to identify an overall statutory scheme made up of the EFTA, a federal statute enacted in 1978, and the UCC, a state statute, the relevant portion of which was enacted in Utah in 1990.[4] ECF No. 21, pp. 12—13; UTAH CODE § 70A-4a-108. Wells Fargo also suggests that "the remaining transfers that make up the complete wire transfer are governed by *neither* the EFTA *nor* the UCC." ECF No. 21, pp. 12—13 (emphasis in original). But Wells Fargo does not identify exactly which "remaining transfers" will not be governed by either the EFTA or Regulation J (the federal statute governing wire transfers).[5]

Finally, a careful application of the whole text canon appears to work in the Nelsons' favor. The EFTA's consumer liability provision notes that, if an unauthorized electronic fund transfer takes place within a transaction that also involves an extension of credit (covered by another EFTA provision), the consumer liability limits established with respect to unauthorized electronic fund transfers prevail. 15 U.S.C. § 1693g. Thus, the EFTA, taken as a whole, indicates that a transaction might involve multiple components, one of which might be an unauthorized electronic fund transfer.

3) Which transfer in the transaction is relevant to determining the Nelsons' and Wells Fargo's liabilities

The EFTA does not provide explicit guidance for determining which transfer within each of the April 2025 transactions is relevant to determining the respective liabilities of the Nelsons and Wells Fargo. However, the EFTA's definition of electronic fund transfers emphasizes the debiting or crediting of consumer accounts. 15 U.S.C. §§ 1693a(2), 1693a(7). Furthermore, as discussed above, the EFTA's consumer liability provision provides clear limits on a consumer's liability for unauthorized electronic fund transfers and makes clear that those limits apply even when the unauthorized electronic fund transfers occur within larger transactions. 15

U.S.C. § 1693g. Thus, it is most consistent with the EFTA's text to conclude that the electronic fund transfer from the Nelsons' account to Wells Fargo's pooled account determines the parties' respective liabilities.

***6** This approach is also most consistent with the underlying facts. The Nelsons' complaint arises out of electronic fund transfers in which Wells Fargo debited the Nelsons' account. While the parties appear to agree that Wells Fargo also credited its own pooled account and later wired equivalent amounts from that pooled account to another bank, those facts are not necessary to describe the loss experienced by the Nelsons. ECF No. 1 ¶ 52; ECF No. 21, p. 2; ECF No. 22, p. 2. Indeed, had Wells Fargo failed to credit its own pooled account, accidentally credited an unrelated account, or failed to wire the corresponding funds to the other bank, the Nelsons' losses would remain unchanged. Thus, it is the electronic fund transfer from the Nelsons' account that determines the Nelsons' liability with respect to each transaction and, to the extent the Nelsons prove that each electronic fund transfer was unauthorized, their liability will be subject to the EFTA's limit on consumer liability for unauthorized electronic fund transfers. 15 U.S.C. § 1693g.

*C. Regulatory Guidance*

While courts "must exercise independent judgment in determining the meaning of statutory provisions," they may "seek aid from the interpretations of those responsible for implementing particular statutes." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). The Federal Reserve Board, and later the Consumer Financial Protection Bureau, have promulgated Regulation E and published other materials providing insight into the interpretation of the EFTA. These sources support the Nelsons' interpretation.

Wells Fargo notes that, in a similar case in the Southern District of New York, the Bureau initially filed a Statement of Interest in support of the Nelsons' proposed interpretation but ultimately withdrew that Statement and reversed its position. ECF No. 21, p. 12; ECF No. 25, pp. 3—4. While this court has reviewed both the original Statement of Interest and the motion withdrawing it, and has carefully considered the claims made in both, the Bureau's position is not binding on federal courts and does not take precedence over the language of the statute. *Loper Bright*, 603 U.S. at 394.

Furthermore, the Bureau's recent motion to withdraw its Statement is difficult to reconcile with both current and previous regulatory guidance (some of which was cited in the Statement itself). Until relatively recently, consumers could not initiate wire transfers without appearing at their bank in person to conduct the transaction. However, since 1996 the official commentary for Regulation E has explained that

> [t]o ensure that the rules for all fund transfers through Fedwire are consistent, the Board of Governors used its preemptive authority under UCC section 4A-107 to determine that subpart B of the Board's Regulation J, including the provisions of Article 4A, applies to all fund transfers through Fedwire, even if a portion of the fund transfer is governed by the EFTA. The portion of the fund transfer that is governed by the EFTA is not governed by subpart B of the Board's Regulation J.

12 C.F.R. pt. 1005, Supp. I, cmt. 3(c)(3)2. The Federal Reserve Board's 1996 revisions to its Official Staff Interpretation of Regulation E specifically note the risk "of subjecting consumers to full liability for unauthorized transfers merely because some part of the transfer, which would ordinarily be covered by Regulation E, is made via Fedwire." 61 FED. REG. 19679—80 (May 2, 1996).

Regulation J, which governs wire transfers, also allows for EFTA coverage of ancillary transfers. The Federal Reserve Board noted in 1990 that

> ***7** [a] funds transfer from a consumer originator or a funds transfer to a consumer beneficiary could be carried out in part through Fedwire and in part through an automated clearing house or other means that is subject to the Electronic Fund Transfer Act or Regulation E. In these cases, subpart B of this part would not govern the portion of the funds transfer that

is governed by the Electronic Fund Transfer Act or Regulation E.

55 FED. REG. 40791, 40804 (Oct. 5, 1990). Regulation J itself provides that it "governs a funds transfer that is sent through the Fedwire Funds Service," even if a portion of the funds transfer is governed by the EFTA, "but the portion of such funds transfer that is governed by the Electronic Fund Transfer Act ... is not governed by this subpart." 12 C.F.R. § 210.25(b)(3). The commentary to Regulation J similarly states that a "funds transfer from a consumer originator or a funds transfer to a consumer beneficiary could be carried out in part through the Fedwire Funds Service and in part through ... [a] means that is subject to the EFTA or Regulation E," in which case Regulation J "would not govern the portion of the funds transfer that is governed by the EFTA or Regulation E." 12 C.F.R. § 210 App. A., § 210.25(b)(4).

*D. Legislative History*

Though the "authoritative statement is the statutory text, not the legislative history or any other extrinsic material," such materials may have a role, "to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." *Exxon Mobil*, 545 U.S. at 568. The EFTA's legislative history offers limited assistance in interpreting the EFTA, but two overarching themes emerge: (1) the EFTA was primarily intended as a consumer protection act; and (2) the lawmakers who wrote and passed the EFTA understood and anticipated that the EFTA would eventually reach technologies and banking services not yet in existence or common usage in 1978.

Turning to the first theme, the EFTA itself provides a clear statement of its own "primary objective": "the provision of individual consumer rights." 15 U.S.C. § 1693. Closer examination of the EFTA's legislative history confirms this. As discussed above, the EFTA was passed following research by the National Commission on Electronic Fund Transfers, which investigated, among other things, the need to protect the legal rights of consumers using electronic fund transfer systems. 1 DONALD I. BAKER, ET AL., THE LAW OF ELECTRONIC FUND TRANSFER SYSTEMS § 12.03 (2026). The Commission's 1977 report emphasized that "[c]entral to all of the Commission's inquiries has been a recognition that the consumer's interests are primary in all regulatory, legislative, and policy decisions affecting [electronic fund transfers], and the consumer's interests must be reflected in such decisions." NATIONAL COMMISSION ON ELECTRONIC FUND TRANSFERS, EFT AND THE PUBLIC INTEREST, p. xii (1977). Indeed, the Commission described consumer's interests as "the most critical factor" in the Commission's recommendations. *Id*.

Congress shared this focus on consumer interests. One member of the House of Representatives, speaking in support of one of the draft versions of the EFTA, explained that the one of the "two most crucial problems presented by electronic banking" was "who should bear liability for unauthorized transfers," and that there was "no Federal law to protect consumers in this regard." 124 CONG. REC. 25729 (1978). Other supporters described the legislation as a "first important step to protect the users and prospective users" of electronic fund transfers and emphasized that "[m]any consumers [were] frightened of banking by computer and what they view[ed] as a dehumanized approach to handling their money." *Id*. at 25735. In the Senate, a supporter of the EFTA noted that the "purpose of the EFT provisions is to provide a basic framework establishing rights, remedies, and obligations of all parties to electronic fund transfers," but the "principal purposes" were "to limit consumer liability, to provide consumers with full and meaningful disclosures and to introduce certainty into this developing area." *Id*. at 36149.

***8** At the same time, legislators were highly aware that electronic fund transfers were a new and dynamic technology and that any legislation would ultimately govern services and technologies not yet in existence or common use at the time the legislation was passed. Debating a draft of the EFTA, one House member explained that he was "not sure that even the most enthusiastic advocate of electronic fund transfer systems [could] envision their eventual applications," but nonetheless believed it was "imperative" that Congress established "certain fundamental rights, remedies, and responsibilities for all participants in the utilization of electronic fund transfer services." *Id*. at 25735. A colleague noted that the EFTA was "a highly complex, often purposely ambiguous statute which attempts to embody a technology yet in its infancy," such that one could not "expect to foresee how it [might] impact even on varied and intricate electronic fund transfer services presently being offered," and "the future [was], of course, far more difficult to predict." *Id*. at 25743. While the EFTA's adopters "might not have anticipated their work would lead to this particular result," they were highly aware that the EFTA would govern transactions they did not know of or anticipate in 1978. *Bostock*, 590 U.S. at 653.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

*E. Persuasive Authority*

Both parties cite cases in which courts have interpreted the EFTA. As mentioned above, the Southern District of New York recently considered facts highly similar to the ones in this case and concluded that the initial electronic fund transfer between a consumer's account and his bank's pooled account is within the scope of the EFTA and subject to the EFTA's limitations on consumer liability for unauthorized electronic fund transfers. *See* *Citibank*, 763 F. Supp. 3d 496. The District Court for the District of South Carolina, in another similar case, came to the same conclusion. *Walling by Walling v. Bank of Am., N.A.*, 782 F. Supp. 3d 280, 289 (D.S.C. 2025). However, the District Court for the Northern District of California declined to follow suit, noting that "[w]hile this Circuit might someday embrace *Citibank*'s reasoning, it has not done so yet." *Jung v. Discover Bank*, 822 F. Supp. 3d 1098, 1102 (N.D. Cal. 2026).

Certain courts have considered facts similar to this case without considering the Nelsons' reasoning. The Fifth Circuit, for example, found that the plaintiff had abandoned the argument that such transactions consist of multiple transfers and therefore refused to consider it. *Nazimuddin v. Wells Fargo Bank, N.A.*, No. 24-20343, 2025 WL 33471, at *2 (5th Cir. Jan. 6, 2025). The District Court for the Central District of California, meanwhile, considered and rejected an argument that the transactions at issue in that case were not made on behalf of a consumer but did not address the possibility that the transactions were made up of multiple transfers. *Rahimian v. Wells Fargo Bank N.A.*, No. CV 24-03787, 2024 WL 4818797, at *7-8 (C.D. Cal. Sept. 20, 2024).

Many courts have applied the EFTA to facts dissimilar to this case. This court found in *Pope v. Wells Fargo* that the EFTA did not apply to a series of consumer wire transfers made by Ms. Pope because Ms. Pope, after being frightened and manipulated by a fraudster, visited a Wells Fargo branch in person and initiated a wire transfer despite a warning from a Wells Fargo teller about the prevalence of wire-transfer frauds. *Pope v. Wells Fargo Bank, N.A.*, No. 2:23-cv-86-JNP-DBP, 2023 WL 9604555, at *3-5 (D. Utah Dec. 27, 2023). The face-to-face nature of the transaction, this court explained, removed it from the scope of the EFTA's coverage. *Id*. at *9; *see also* *Wachter v. Denver Nat'l Bank*, 751 F. Supp. 906, 908 (D. Colo. 1990) (reasoning that the "presence of personal contact with bank personnel who intercede between a consumer and the electronic device used to facilitate a transaction removes that transaction from the scope of" the EFTA). In other cases, courts have found that plaintiffs alleged the existence of unauthorized wire transfers but did not allege that any initial electronic fund transfer occurred, rendering the EFTA inapplicable. *Dickson v. Wells Fargo Bank, N.A.*, No. 25-80095-CIV-CANNON, 2025 WL 1517528, at *3 (S.D. Fla. May 16, 2025).

***9** Finally, Wells Fargo cites two cases from courts outside the Tenth Circuit in which courts opined on the interpretation of "funds transfers." ECF No. 21, p. 11. Both cases concern efforts by victims of terrorism to satisfy judgments against foreign sovereigns, and both cases apply UCC definitions of electronic funds transfers. *Calderon-Cardona v. Bank of New York Mellon*, 770 F.3d 993, 1001-002 (2d Cir. 2014); *Heiser v. Islamic Republic of Iran*, 735 F.3d 934, 935-36 (D.C. Cir. 2013). As will be discussed below, however, the UCC explicitly defines funds transfers, and its definition diverges from the term's usage in the EFTA. [6]

*F. The Safe Harbor Provision*

Wells Fargo, in support of its argument that this court should defer to the Bureau's current approach to the EFTA, suggests that "Congress has explicitly authorized deference to the agencies tasked with implementing the EFTA" by "codif[ying] a safe harbor within the EFTA for good faith reliance on such agency interpretations." ECF No. 25, p. 4. But Wells Fargo has not identified a "rule, regulation, or interpretation thereof by the Bureau or the Board" supporting its reading of the EFTA. 15 U.S.C. § 1693m(d). As discussed above, regulations issued by the Federal Reserve Board and Bureau in fact appear to support the Nelsons' interpretation. Wells Fargo attempts to characterize the Bureau's motion to withdraw its Statement of Interest in *Citibank* as an interpretation, but that withdrawal explicitly states that "the Bureau disclaims the position advanced in the Statement of Interest and *takes no position on this matter*." Motion to Withdraw Consumer Financial Protection Bureau's Statement of Interest at 2, *New York by James v. Citibank, N.A.*, 763 F. Supp. 3d 496, 511 (S.D.N.Y. 2025) (No. 69) (emphasis added). The Bureau's explicit refusal to take a position is not one of the bases for good faith compliance identified in § 1693m(d).

Even if Wells Fargo could identify a rule, regulation, or interpretation supporting its claim for safe harbor, that safe

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

harbor would not escape the reasoning of the District Court for the Southern District of New York's decision in *Citibank*. Section 1693m(d) shields only actions taken before "such rule, regulation, approval, or model clause is amended, rescinded, or determined by judicial or other authority to be invalid for any reason." 15 U.S.C.A. § 1693m(d). The transactions at issue occurred in April 2025, well after *Citibank* was decided in January 2025. Furthermore, while § 1693m(d) "authorize[s] [the Bureau] to exercise a degree of discretion," this court must "independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Loper Bright*, 603 U.S. at 394–95. Congress cannot authorize private parties to ignore the courts' interpretation of federal statutes, nor can it delegate to the Bureau or any other agency the power to issue such authorizations. Once Southern District of New York found in *Citibank* that the EFTA applies to transfers like the ones at issue in this case, the safe harbor provision ceased to shield banks from liability for refusing to apply the EFTA to such transfers.

In summary, the Nelsons' interpretation of the EFTA is supported by the EFTA's text, by regulatory guidance, and by legislative history. Though courts have yet to come to consensus on this issue, the text of the statute must prevail. Wells Fargo's motion to dismiss the Nelsons' EFTA claim is therefore denied.

### II. UTAH'S UNIFORM COMMERCIAL CODE

***10** The application of the EFTA to the initial electronic fund transfers in the April 2025 transactions precludes the application of Utah's UCC. Utah's UCC includes a chapter on funds transfers, but that chapter states that it "does not apply to a funds transfer any part of which is governed by the Electronic Fund Transfer Act." Utah Code Ann. § 70A-4a-108. Unlike the EFTA, the UCC defines funds transfer as encompassing "the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order." UTAH CODE § 70A-4a-104. The Nelsons' UCC claims are therefore dismissed.

### III. NEGLIGENCE

At the outset, Wells Fargo argues that the Nelsons' common law claims are preempted by Utah's UCC. ECF No. 21, p. 19. This court need not decide whether the application of common law principles in this case would "create rights, duties and liabilities inconsistent with" the UCC because, as discussed above, the UCC does not apply to the April 2025 transactions. *See* UTAH CODE § 70A-4a-102, cmt.

Wells Fargo also argues that Utah's economic loss rule bars the Nelsons' negligence claim. ECF No. 21, p. 24; ECF No. 25, p. 11. "The economic loss rule is a judicially created doctrine that marks the fundamental boundary between contract law, which protects expectancy interests created through agreement between the parties, and tort law, which protects individuals and their property from physical harm by imposing a duty of reasonable care." *Reighard v. Yates*, 285 P.3d 1168, 1176 (Utah 2012), quoting *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P. 3d 234, 242 (Utah 2009). "The economic loss rule prevents recovery of economic damages under a theory of nonintentional tort when a contract covers the subject matter of the dispute." *Reighard*, 285 P.3d at 1176. "When a duty exists that does not overlap with those contemplated in a contract, 'the economic loss rule does not bar a tort claim.' " *Id.* at 1177 (citation omitted). Thus, Wells Fargo must show that its contracts with the Nelsons cover the subject matter of the dispute—i.e., the fraud detection measures that the Nelsons allege Wells Fargo failed to enact.

Wells Fargo cites two provisions of the Online Access Agreement between Wells Fargo and the Nelsons to support the claim that "the Online Access Agreement governs Wells Fargo's duty in processing wire transfers, and specifically provides that Wells Fargo has no duty to investigate a customer's wire transfer requests." ECF No. 21, p. 25. The first, Provision 8(b), is titled "Security Procedure" and lists security and authentication methods that Wells Fargo "may require from time to time" (i.e., verifying a customer's username and password, requiring a customer to answer security questions, and using random number generators and one-time passcodes). ECF No. 21, Exhibit 2, p. 18. Provision 8(b) also states that the Nelsons "agree to be bound by any Order that Wells Fargo receives and verifies following the Security Procedure, even if the Order was not authorized by" the Nelsons. *Id.* Wells Fargo also cites Provision 8(g), titled "Cancellation and Amendment," which notes that Wells Fargo may cancel or reject a transaction "based on confidential information" and states that "[n]othing herein creates a duty for Wells Fargo to monitor or review

wires beyond that which is required under applicable law." *Id.* at 19.

Wells Fargo finds itself in a bind. For the economic loss rule to apply, Wells Fargo must show that the Online Access Agreement covers Wells Fargo's fraud detection obligations. Provision 8(b) lists potential elements of Wells Fargo's "Security Procedure" but does not state that Wells Fargo will (or will not) employ fraud detection measures like the ones described in the Nelsons' Complaint (e.g., monitoring unusually large transactions, transactions involving a new bank, and transactions involving a new beneficiary). ECF No. 1 ¶¶ 21, 28, 78. Indeed, the Online Access Agreement, apparently seeking to ensure that it cannot be read to create any fraud-detection obligations, does not directly address fraud detection measures, except to note that "[n]othing herein creates a duty for Wells Fargo to monitor or review wires beyond that which is required under applicable law." ECF No. 21, Exhibit 2, p. 19. That provision appears to be an explicit statement that the Online Access Agreement does not cover fraud detection measures, rendering the economic loss doctrine inapplicable to the Nelsons' negligence claim.

***11** Wells Fargo also argues that, as a matter of law, banks owe no duty to their customers to enact fraud detection measures. ECF No. 21, p. 23. In Utah, a plaintiff bringing a negligence claim must show "a duty, breach of that duty, causation, and damages." *McCartney v. United States*, 31 F. Supp. 3d 1340, 1343 (2014). Wells Fargo cites two cases for the proposition that banks have no duty to detect fraud or protect their customers from fraud. ECF No. 21, pp. 23-24. Both come from California Courts of Appeal applying California law, limiting their utility to this court's analysis. *See* *Das v. Bank of America, N.A.*, 112 Cal. Rptr. 3d 439, 451 (Cal. Ct. App. 2010); *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, 56 Cal. Rptr. 2d 756, 762 (Cal. Ct. App. 1996). Though Utah's courts have not considered a bank's duty of care (or lack thereof) in this precise context, Utah's Supreme Court has found that Utah's UCC, which states that banks and their customers "may not disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care, or limit the measure of damages for the lack or failure," recognizes that all banks must use ordinary care in their dealings. UTAH CODE § 70A-4-103; *Arrow Indus. v. Zions First Nat'l Bank*, 767 P.2d 935, 937-39 (Utah 1988).[7] The Nelsons have alleged that Wells Fargo had a duty to exercise ordinary care, that Wells Fargo breached that duty by disregarding "red flags" about the April 2025 transactions and failing to adhere to industry security standards, that the breach allowed the transactions to occur, and that the Nelsons suffered harm as a result. ECF No. 1 ¶¶ 78—80. Though not required, they have provided detailed factual allegations to support their entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, it is not appropriate to dismiss the Nelsons' negligence claim at this time.

### IV. BREACH OF CONTRACT

The Nelsons allege that Wells Fargo breached an "online banking agreement." ECF No. 1 ¶ 81. Wells Fargo notes that the Nelsons are party to two agreements with Wells Fargo, but the language the Nelsons cite appears in the Online Access Agreement. ECF No. 21, p. 21. The Nelsons do not appear to contest this. ECF No. 22, pp. 15-16.

Wells Fargo has demonstrated that it is entitled to the dismissal of the Nelsons' breach of contract claim. The Nelsons allege that Wells Fargo breached the Online Access Agreement by allowing the transactions to occur; by disregarding "red flags;" by failing to follow industry security standards; and by failing to ask the actor initiating the transactions a "sophisticated security question." ECF No. 1 ¶ 85 (the Complaint also references unspecified "other acts and omissions," without explaining how those acts or omissions breached the Online Access Agreement). The Online Access Agreement does not require Wells Fargo to prevent unauthorized transactions from occurring; to heed red flags; to follow industry security standards; or to ask anyone initiating a transaction a security question. ECF No. 21, Exhibit 2, p. 18. As Wells Fargo notes, the Online Access Agreement says only that Wells Fargo *may* use certain security measures, including security questions and one-time passcodes. *Id.*; ECF No. 21, p. 22; ECF No. 25, p. 10. Though the Nelsons also argue that the Online Access Agreement obligates Wells Fargo to use commercially reasonable security procedures, the text of the Agreement states only that the Nelsons "agree the Security Procedure is commercially reasonable." ECF No. 21, Exhibit 2, p. 18. While this language does not prove that Wells Fargo's security procedure was commercially reasonable, it is also insufficient to create a contractual obligation that the security procedure be commercially reasonable. The Nelsons' breach of contract claim is therefore dismissed with prejudice.

***12** At oral argument, counsel for the Nelsons raised for the first time a breach of contract claim based on Section 5 of the Online Access Agreement, which summarizes the EFTA's

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

consumer liability limitations. *See Id.*, p. 7. But "it is not appropriate for [a plaintiff] to raise new claims in response to a motion to dismiss." *In re Byrnes*, No. 20-12086-t7, 2021 WL 4047461 at *5 (Bankr. D.N.M.) (collecting cases).

**V. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

The only argument Wells Fargo offers concerning the Nelsons' claim for breach of the implied covenant of good faith and fair dealing is that it is preempted by Utah's UCC. ECF No. 21, pp. 3, 19-21; ECF No. 25, pp. 8-9. As discussed above, the UCC does not apply to the April 2025 transactions. *See supra* Section II. Wells Fargo has not offered any other reasoning to support dismissal of this claim.

Though Utah's law is not entirely clear, the Nelsons' good faith and fair dealing claim likely survives the demise of their breach of contact claim. Utah's Supreme Court has found that "[a]n implied covenant of good faith and fair dealing inheres in every contract," and a "violation of the covenant is a breach of the contract." *Eggett v. Wasatch Energy Corp.*, 94 P.3d 193, 197 (Utah 2004). But the implied covenant "should serve a limited role," as overuse threatens commercial certainty and increases litigation. *Joffrey v. Money Insights, LLC*, No. 2:25-CV-00637-JNP-DAO, 2026 WL 850788, at *1 (D. Utah Mar. 27, 2026). Furthermore, an "implied covenant claim fails as a matter of law" if "it merely restates [the plaintiff's] breach of contract claim." *Id*. at *2.

Nonetheless, Utah's Supreme Court declined to overturn a Utah Court of Appeals decision finding that a "breach of the implied covenant of good faith and fair dealing is an independent cause of action." *Olympus Hills Shopping Center, Ltd. v. Smith's Food & Drug Centers, Inc.*, 889 P.2d 445, 457 n.12 (Utah Ct. App. 1994), *cert. denied*, 899 P.2d 1231 (Utah 1995). Utah's Court of Appeals therefore concluded that "[w]hen a claim for breach of contract is pleaded separately from a claim for breach of the implied covenant," it is plausible to "construe the breach of contract claim as seeking relief for breaches of express terms of the contract, and to construe the claim for breach of the implied covenant as seeking relief only for breaches of that particular implied provision." *Ole Mexican Foods Inc. v. J & W Distribution LLC*, 549 P.3d 663, 673, *cert. denied sub nom. Ole Mexican Foods v. J & W Distribution*, 558 P.3d 88 (Utah 2024). In the absence of greater clarity from Utah's Supreme Court, this court will allow the Nelsons' good faith and fair dealing claim to stand as an independent cause of action.

**CONCLUSION AND ORDER**

For the reasons above, the motion to dismiss is DENIED in part and GRANTED in part. The motion is DENIED with respect to the Nelsons' EFTA claim, negligence claim, and claim for breach of the implied covenant of good faith and fair dealing. The motion is GRANTED with respect to the Nelsons' UCC claims and breach of contract claim.

**All Citations**

Slip Copy, 2026 WL 2797345

## Footnotes

1 "In reviewing an order granting a motion to dismiss ... the district court[ ] ... accept[s] the well-pleaded facts alleged as true and view[s] them in the light most favorable to the plaintiff." *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1144 (10th Cir. 2023). Here, it appears that Wells Fargo agrees that "[f]raudsters obtained access to Plaintiffs' consumer checking account with Wells Fargo" and "placed payment orders for three separate wire transfers from Plaintiffs' account to an account at another bank." ECF No. 21, pp. 2, 4.

2 The Federal Reserve Board had oversight and rulemaking authority over the EFTA and was responsible for promulgating and maintaining Regulation E until 2011, when that authority was transferred to the Consumer Financial Protection Bureau. 1 DONALD I. BAKER, ET AL., THE LAW OF ELECTRONIC FUND TRANSFER SYSTEMS § 12.03 (2026).

3 Wells Fargo offers discussion of the use of terms such as "transfer of funds" and "fund transfer" in various materials, including a 1953 Federal Reserve report, the Uniform Commercial Code (as enacted by the Utah state legislature, not Congress), and several judicial opinions. ECF No. 21, pp. 10—11. These materials are of limited utility to this analysis because they address distinct terms and do not reflect the views of either ordinary Americans or Congress.

4 Wells Fargo's theory of a unitary statutory scheme is further complicated by the fact that the UCC chapter addressing funds transfers was not created until 1989. DONALD I. BAKER, ET AL., THE LAW OF ELECTRONIC FUND TRANSFER SYSTEMS § 13.02 (2026).

5 As will be discussed below, Wells Fargo is correct in arguing that, if the EFTA applies to part of a transaction, then Utah's UCC provisions on funds transfers do not apply. *See* ECF No. 21, p. 11; *infra*, Section II.

6 *See infra*, Section II. Note that the UCC uses the term "fund**s** transfer" while the EFTA uses "electronic fund transfer." Given the two statutes' differing enacting legislatures and dates of enactment, this disparity provides little support for either interpretation of the EFTA.

7 This duty of ordinary care, owed by banks to their customers under Utah law, also distinguishes this case from *Bloom v. PNC Bank*, cited by both parties in their submissions to the court. *Bloom v. PNC Bank, N.A.*, 659 F. Supp. 3d 27 (D.D.C. 2023). *Bloom*, which did not apply Utah law, found that the independent duty rule barred the plaintiff's negligence claim because: (a) the tort did not exist independent of the plaintiff's contracts with the bank; and (b) the plaintiff's contracts with the bank established the relevant duty of care. *Id.* at 33. These findings are distinguishable from the present case, where Utah's UCC recognizes a duty owed by Wells Fargo to the Nelsons and the Online Access Agreement specifically declines to establish a duty of care for fraud detection methods.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.