UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICKY H. CHEN, et al.,<br>Plaintiffs,<br>v.<br>BANK OF AMERICA, N.A.,<br>Defendant. | Case No. 25-cv-03790-EMC<br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS**<br>Docket No. 52 |

Plaintiffs Ricky Chen and his wife, Amin Wu, allege a fraudster wrongfully assumed his identity and utilized electronic means to initiate the extraction and transfer of $106,000 from the couples' Bank of America accounts to the fraudster's Chase account. Though this is precisely the kind of unauthorized electronic fund transfer normally covered by the Electronic Fund Transfer Act which protects consumers like Mr. Chen from catastrophic loss, the Bank of America contends the protections of the act do not apply to Mr. Chen, because the transfer of funds from the Bank of America to Chase incidentally involved a wire transfer, a fact unbeknownst to Mr. Chen and immaterial to his loss. The question before the Court is whether consumers like Mr. Chen should be stripped of the protection of the Act.

Plaintiffs, a putative class represented by Mr. Chen and Ms. Wu, filed suit against Defendant Bank of America for violations of the Electronic Fund Transfer Act ("EFTA"). Plaintiffs allege that Defendant improperly refused to apply the protections of the EFTA to their disputed transactions on the basis that one portion of the disputed transactions involved a wire transfer between banks. Defendant moves to dismiss the case, arguing that (1) the EFTA does not apply to any transaction which involves a wire transfer, and (2) Plaintiffs have failed to adequately plead an unauthorized transfer. Because the Court finds that the EFTA applies to intrabank

electronic transfers regardless of an ancillary wire transfer, Defendant's Motion to Dismiss is **DENIED**.

## I. BACKGROUND

### A. Statutory Background

In 1978, to address concerns of fraud against consumers raised by new electronic banking technologies, Congress enacted the EFTA. 15 U.S.C. § 1693 *et seq.*; S. Rep. No. 95-915 (1978); *Widjaja v. JPMorgan Chase Bank, N.A.*, 21 F.4th 579, 580 (9th Cir. 2021). Among other consumer protection measures, the EFTA limits consumers' liability for an "unauthorized electronic fund transfer." 15 U.S.C. § 1693g(a). This term is defined in section 1693a:

> (7) the term "electronic fund transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone.
>
> Such term does not include—
>
> […]
>
> (B) any transfer of funds, other than those processed by automated clearinghouse, made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer;
>
> […]
>
> as determined under regulations of the Bureau;
>
> (12) the term "unauthorized electronic fund transfer" means an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit . . . .

Generally, the EFTA caps consumer liability for timely reported unauthorized electronic fund transfers at $50 if the consumer's debit card or other means of access are used by a fraudster. 15 U.S.C. § 1693g(a)(1); 12 C.F.R. § 1005.6(b)(1). The cap may increase under certain conditions not at issue here. 15 U.S.C. § 1693g(a)(2); 12 C.F.R. § 1005.6(b)(2)–(3). The EFTA also imposes

investigation obligations on banks when they are notified of an unauthorized electronic fund transfer. 15 U.S.C. § 1693f(a).

Regulation E, codified at 12 C.F.R. Part 205, implemented the EFTA. In outlining the EFTA's coverage of electronic fund transfers, the regulation provides:

> (b) Electronic fund transfer —
>
> (1) Definition. The term electronic fund transfer means any transfer of funds that is initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account. The term includes, but is not limited to —
>
> (i) Point-of-sale transfers;
> (ii) Automated teller machine transfers;
> (iii) Direct deposits or withdrawals of funds;
> (iv) Transfers initiated by telephone; and
> (v) Transfers resulting from debit card transactions, whether or not initiated through an electronic terminal.
>
> […]
>
> (c) Exclusions from coverage. The term electronic fund transfer does not include:
>
> […]
>
> (3) Wire or other similar transfers. Any transfer of funds through Fedwire or through a similar wire transfer system that is used primarily for transfers between financial institutions or between businesses.

12 C.F.R. § 205.3.

Wire transfers that are exempted from the EFTA's definition of "electronic fund transfer" under section 1693a(7)(B) ("Section 7(B)") are covered not by the EFTA but by Article 4A of the Uniform Commercial Code ("UCC"). Article 4A of the UCC has been adopted by all 50 states, including California, and is codified as Division 11 of the California Commercial Code. *See* Cal. Com. Code § 11101 *et seq*. While Article 4A provides some liability for unauthorized wire transfers, its protections are not as robust as those of the EFTA. *See* Cal. Com. Code §§ 11201–11204, 11303–11305. Article 4A provides that the UCC "does not apply to a funds transfer any part of which is governed by the [EFTA]." UCC § 4A-108; Cal. Com. Code § 11108(a).

United States District Court
Northern District of California

**B. Factual Background**

On September 15, 2024, Plaintiff Ricky Chen received a text message, purportedly on behalf of Bank of America ("BoA"), asking him to confirm or deny a $26.02 credit card charge with Apple. Dkt. No. 46 ("FAC"), ¶ 29. Mr. Chen denied the charge over text. *Id.* ¶ 30. The next day, he received another text message, again purportedly from BoA, asking him to confirm or deny a debit card charge for approximately $1,502 with Hertz Rent-A-Car. *Id.* ¶ 31. He again denied the charge via text. *Id.* ¶ 32.

Moments after doing so, Mr. Chen received a phone call from someone purporting to represent BoA. *Id.* ¶ 33. The caller advised Mr. Chen that his account was under attack and that BoA needed to review Mr. Chen's account activity. *Id.* ¶ 34. The caller told Mr. Chen that BoA would FaceTime him so that they could discuss the account activity face-to-face. *Id.* ¶ 35. Mr. Chen, not knowing that the caller was a fraudster, accepted the call. *Id.* ¶ 37, 38.

During the FaceTime, the caller gained access to Mr. Chen's iPhone using Apple's "remote control" feature. *Id.* ¶ 38. Mr. Chen did not realize he was giving the caller this access; he believed he was sharing his screen. *Id.* ¶¶ 39–40. Plaintiffs allege that through the remote-control feature, the fraudster was able to take over Mr. Chen's iPhone, including his BoA iPhone app. *Id.* ¶ 41. The fraudster's access to this app allowed them to initiate two electronic transfers without Mr. Chen's knowledge or consent. *Id.* ¶ 42–46. One of the transfers removed $78,000 from Plaintiffs' Preferred Rewards checking account, funds that were eventually sent to an external account with Chase Bank, purportedly belonging to an unknown entity named "Ship N Slide LLC." *Id.* ¶ 47. The other transfer removed $28,000 from Mr. Chen's Preferred Rewards savings account, which was then sent to the same external Chase account. *Id.* ¶ 48.

Plaintiffs realized that they had been defrauded within minutes of the transfers and immediately called BoA to dispute the transfers. *Id.* ¶¶ 51–52. Plaintiffs explained to BoA what had happened, including that they mistook a fraudster for BoA personnel, that the fraudster appeared to have obtained remote access to Mr. Chen's phone, and that they had not personally authorized any transactions. *Id.* ¶¶ 54–58.

On September 27, 2024, BoA denied Plaintiffs' claims in a written response. *Id.* ¶ 60. The

response stated that BoA's investigation showed that "the transaction in question was performed by an authorized signer on the account." *Id.*

On December 5, 2024, BoA separately responded that "the transaction in question was confirmed valid by you via (SMS /MMS) text message response or speaking directly with Fraud Detection employee. Our investigation found that the transaction in question was completed using a device that is consistent with previous valid account activity." *Id.* ¶ 62.

After Plaintiffs appealed the decision, BoA maintained its position "that no bank error occurred in the management of [Mr. Chen's] account as the transactions were sent in accordance with [Mr. Chen's] instructions we received." *Id.* ¶ 66. BoA further stated "We regret learning that you may have been the victim of a scam. Although no one expects to be victimized, it is important for consumers to be aware of the circumstances under which they transact business. Bank of America will fully cooperate with any law enforcement agency if we are contacted about a fraud investigation." *Id.* On March 5, 2025, BoA sent another response, stating, "Our investigation regarding claim numbers 16SEP2024-821724 and 16SEP2024-821769 found that the transactions in question were confirmed as valid by text message response or speaking directly with our Fraud Detection Department. Furthermore, our investigation found that the transaction in question was completed using a device that is consistent with previous valid account activity." *Id.* ¶ 68.

Plaintiffs allege that the transactions debited Plaintiffs' accounts via transfers that qualify as "electronic fund transfers[s]" as that term is defined in the EFTA, and thus Plaintiffs are entitled to protection thereunder. *Id.* ¶ 10 (citing 15 U.S.C. § 1693a(7)). But BoA considered the transactions as "wire transfers" because the "debited funds were subsequently transferred [to the external bank] through Fedwire or a similar wire transfer system." *Id.* ¶ 12. Plaintiffs allege that BoA thus evaluated Plaintiffs' right to reimbursement under Article 4A of the Uniform Commercial Code ("UCC"), and not the EFTA. *Id.* ¶ 13. Plaintiffs argue that application of Article 4A of the UCC, rather than the EFTA, was a mistake of law because a "so-called 'wire transfer' consummated online invariably involves an intrabank debit[] that precedes the bank-to-bank wire transfer." *Id.* ¶ 81. That initial "electronically initiated debit is covered by the EFTA," Plaintiffs say. *Id.* ¶ 82.

United States District Court
Northern District of California

Plaintiffs filed this complaint on May 1, 2025. Dkt. No. 1. On October 20, 2025, the Court granted Defendant's motion to dismiss the original complaint, finding that Plaintiffs had failed to sufficiently allege an unauthorized transfer. Dkt. No. 44. Dismissal was with leave to amend. *Id.* Plaintiffs filed an amended complaint addressing the deficiency, and Defendant now moves again to dismiss. Dkt. No. 46, 52.

## II. LEGAL STANDARD

A complaint that fails to state a claim for relief may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

## III. DISCUSSION

### A. <u>The EFTA Applies to the Transactions at Issue.</u>

As noted above, the parties dispute whether Plaintiffs' liability for the unauthorized transactions should be governed by the EFTA or Article 4A of the UCC. Plaintiff argues that any electronically initiated "wire transfer," such as the transfers at issue here, "necessarily involves an EFTA-covered electronic fund transfer – from the consumer's account to the consumer's bank –

before a bank-to-bank wire takes place." Dkt. No. 55 ("Opp'n"), at 7. Plaintiffs explain that each transaction included three different segments: 1) Debit of Plaintiffs' Personal Account and concomitant Credit of BoA (an intrabank transfer); 2) Debit of BoA and concomitant Credit of Chase Bank (an interbank transfer); 3) Debit of Chase Bank and concomitant Credit of "Ship N Slide LLC's" Personal Account (an intrabank transfer). Under Plaintiffs' theory, the first and third segments are intrabank transfers (not involving a wire transfer) covered by the EFTA, while only the second segment, the interbank wire transfer, is excluded by Section 7(B). Defendant, on the other hand, argues that Section 7(B) exempts from the definition of "electronic fund transfer" "the full end-to-end transfer of funds, including the debit of the sender's account[.]" Dkt. No. 52 ("Mot."), at 14. In other words, so long as the overall transaction involved a wire transfer, the entire transfer end-to-end is exempt from the EFTA. For the reasons below, the Court finds that Plaintiffs' construction of the EFTA is correct.

**1. <u>The Statutory Text</u>**

"As always, we begin with the text of the statute." *Friends of Animals v. U.S. Fish & Wildlife Serv.*, 879 F.3d 1000, 1003 (9th Cir. 2018) (quoting *Limtiaco v. Camacho*, 549 U.S. 483, 488 (2007)). The EFTA applies to an "electronic fund transfer," which Section 7 defines as "any transfer of funds . . . which is initiated through an electronic terminal, telephonic instrument, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7). Account is defined as "a demand deposit, savings deposit, or other asset account . . . established primarily for personal, family, or household purposes." *Id.* § 1693a(2). In other words, "account" refers to a consumer account, as opposed to a commercial or internal bank account. In the first instance, then, Section 7, by its plain terms, covers the transactions at issue here. The debits from Plaintiffs' accounts were initiated through an electronic terminal – the BoA banking app on Mr. Chen's phone – so as to instruct BoA to debit the Chens' personal accounts.

The dispute is whether the exemption in Section 7(B) should be construed to swallow the application of Section 7. Section 7(B) exempts "any transfer of funds . . . made . . . by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions

and which is not designed primarily to transfer funds on behalf of a consumer." *Id.* § 1693a(7)(B). It is undisputed that "a service" refers to a wire transfer service. Mot. at 10. Thus, the text of Section 7(B) exempts wire transfers from the EFTA. The text is less clear on whether a "wire transfer" includes only the portion of a multi-step transaction that is actually a wire transfer or whether it includes the full end-to-end transaction even though only a part of which involves a wire transfer.

The text of the statute allows for three possible ways in which the EFTA might apply (or not) to the transactions at issue. First, Section 7 could apply to all end-to-end transactions that start or end with the credit or debit of a consumer account (including any intermediary interbank wire transfer), and Section 7(B) would exclude any end-to-end transaction if any part of that transaction includes a wire transfer. Second, Section 7 could apply only to transfers where a consumer account is credited or debited directly: that is, to the first and third intrabank segments of the transactions which do not utilize a wire transfer. Any intermediate interbank wire transfer segments would necessarily be excluded. Third, Section 7 could apply to all end-to-end transactions that start or end with the credit or debit of a consumer account, and Section 7(B) would exclude only the bank-to-bank wire transfers that are part of such transactions. The Court refers below to these three possible interpretations as Option 1, Option 2, and Option 3.

For the reasons explained below, while there is some textual support for each of the Options, the Court finds Option 3's interpretation the most plausible.

**a. <u>Option 1: Sections 7 and 7(B) Refer to End-to-End Transactions</u>**

**i. <u>"Transfer of Funds"</u>**

Defendant BoA argues that the term "transfer of funds" in both Section 7 and 7(B) must be read consistently to include the full end-to-end transaction to ensure that the phrase's meaning is consistent across the two sections. Mot. at 15. Under BoA's interpretation, Section 7(B)'s exclusion would thus remove from Section 7's coverage the entirety of the end-to-end transaction otherwise encompassed by Section 7 if any part of the transaction included a wire transfer.
It is true that "identical words used in different parts of the same statute are generally presumed to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005). Here, Section 7 includes

"*transfer[s] of funds*" that are "initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape" whereby the consumer "order[s], instruct[s], or authorize[s] a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7). Section 7(B)'s exclusion applies to a "*transfer of funds*" made by a financial institution through a transfer system that is used primarily for transfers between financial institutions or between businesses.

As BoA suggests, the definition of the term "transfer of funds" may be interpreted as the same under both Sections 7 and 7(B). The EFTA does not define "transfer" as it is used in Section 7 or 7(B). "When a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). The ordinary meaning of "transfer" as a noun is the act of moving something from one location to another. Under this ordinary meaning, "transfer of funds" means a movement of funds from one account to another. While BoA is correct that same definition presumably applies to both Section 7 and Section 7(B), BoA glosses over the critical fact that while the meaning of "transfer of funds" may be the same, the *qualifiers* of the term differ between Sections 7 and 7(B).

In Section 7, "transfer of funds" is modified by "*which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account*," account being defined by 15 U.S.C. § 1693a(2) as a consumer account. In Section 7(B), "transfer of funds" is modified by "*made . . . by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer*" – i.e., a wire transfer between banks not primarily designed for consumer transfers. Hence, the use of the term "transfer of funds" in both sections does not imply that both Sections 7 and 7(B) must be read to apply to the same end-to-end transfer. The two sections can be read to cover two different kinds of transfers of funds – funds which involve intrabank transfers to or from a consumer account (Section 7) and wire transfers between commercial banks (Section 7(B)).[1]

[1] For instance, imagine that the word "vehicle" appears in two provisions of a statute, and the first provision states that the statute applies to "vehicles with motors" while the second provision

United States District Court
Northern District of California

Both the District Court for the Southern District of New York and the District Court for the District of Utah rejected arguments identical to BoA's assertion that "transfer of funds" must include the end-to-end transaction in both Section 7 and Section 7(B). *New York by James v. Citibank, N.A.*, 763 F. Supp. 3d 496, 509–11 (S.D.N.Y. 2025); *Nelson v. Wells Fargo Bank, N.A.*, 2026 WL 2797345, at *4 (D. Utah Sep. 18, 2026); *see Walling by Walling v. Bank of Am., N.A.*, 782 F. Supp. 3d 280 (D.S.C. 2025) (accord). As the *Citibank* court reasoned, the statute is best understood when interpreting "transfer" to refer to a "movement of funds" generally, with the understanding that the term is modified by different qualifiers in different subsections of the statute. *See* 763 F. Supp. at 509. The meaning of the term "transfer" as used in Section 7(B) is made clear by Section 7(B)'s "subsequent use of an almost identical term: 'by means of a service that *transfers* funds held at either Federal Reserve banks or other depository institutions.' As used in that phrase, 'transfers' refers only to the movement of funds within a wire network." *Id.* (footnote omitted). Similarly, the District of Utah pointed to this use of the word "transfer" and concluded that there is no indication in the text of the statute "that a reader should conceptualize a transaction that includes a transfer within the meaning of Subsection 7(B) as a unitary whole such that those ancillary transfers are swept into Subsection 7(B)'s exemption." *Nelson*, 2026 WL 2797345, at *4. Thus, a consistent meaning of "transfer of funds" does not provide substantial support of Option 1 because the qualifiers of that term differ between Section 7 and Section 7(B) – "transfer of funds" need not refer to end-to-end transfers under both sections.

**ii. <u>Superfluidity</u>**

BoA further argues Section 7 must include the entire-end-to-end transaction because Section 7's use of the phrase "does not include" to exclude transactions specified in Section 7(B) implies that the types of transfers specified in Section 7(B) must be an "exception" from the preceding statutory definition in Section 7. Mot. at 14. To be *excepted* by Section 7(B), BoA

---

clarifies that the statute does not apply to "vehicles operated with pedals." It would not be the case that "vehicles" in the second provision must necessarily only include "vehicles with motors." Rather, the reader would understand that there are many types of vehicles, some with motors and some without, and that each provision referenced different types of vehicles. So too here, "transfer of funds" could have the same, general meaning across both sections, and its qualifiers simply distinguish among types of transfers.

says, wire transfers must first be *included* in Section 7. For wire transfers to be included in Section 7 (and subsequently excluded by Section 7(B)), "transfer of funds" under Section 7 must be defined to include full end-to-end transactions, including wire transfers. If Section 7 were construed to include only transfers of funds to and from consumer accounts and not interbank wire transfers, there would be no need for the exclusion ("does not include") of interbank wire transfers under Section 7(B), and this would render Section 7(B) superfluous.

But the superfluidity argument carries little force here. In *Citibank*, the court noted that "the EFTA does not call subsection (7)(B) an 'exemption,' which would otherwise imply that it removes from the EFTA's coverage something that was already there." 763 F. Supp. 3d at 513. Instead, the court reasoned, 7(B) is only a "clarification." *Id.* Thus, "it would not be superfluous to phrase the provision as Congress chose, using clarifying language to ensure that purely interbank wires were beyond the reach of EFTA." *Id.*

Moreover, as *Citibank* points out, before online banking became commonplace, wire transfers were generally initiated by the consumer in person, not through an electronic terminal. 763 F. Supp. 3d. at 514 ("Consider the type of 'consumer wire' that Congress would have known about in 1978: a consumer walking into a bank office and requesting that bank to wire money on their behalf."). As *Citibank* reasoned:

> Congress may have been concerned that the actual bank-to-bank wire transfer that would follow the in-person conversation would be subject to EFTA liability. After all, the bank-to-bank wire is a "transfer of funds," "initiated through an electronic terminal," that "order[s], instruct[s], or authorize[s] a financial institution to . . . debit or credit an account." 15 U.S.C. § 1693a(7). If Congress wrote subsection (7)(B) to exclude a bank-to-bank wire originally requested in person by a consumer, it would have been acting according to the motives that both parties agree led to subsection (7)(B) in the first place: keeping EFTA liability out of the wire network. . . . Not only would that explain the purpose behind the subsection; it would render it non-superfluous, as well. But even if that is incorrect, and the technical definition of an EFT did not include the bank-to-bank wire resulting in a consumer credit, it would not have been unreasonable for Congress to cover its bases with a potentially unnecessary exemption, as it was legislating amid significant legal and technological uncertainty.

*Id.* Section 7(B) serves a function even if Section 7 is not broadly construed to encompass the entire transfer end-to-end. Section 7(B) made clear that a traditional wire transfer initiated by a



United States District Court
Northern District of California

consumer who appeared in person (and not initiated electronically), as was common when the EFTA was first enacted, is not covered by the Act.

Furthermore, as both *Citibank* and *Nelson* noted, "the EFTA is not a model of brevity." *Nelson*, 2026 WL 2797345, at *4. "Congress drafted the same section of the EFTA with at least one other instance of the same form of supposed surplusage, suggesting the Court need not select less textually plausible interpretations just to avoid surplusage." *Citibank*, 763 F. Supp. 3d at 514 (referring to the definition of "unauthorized electronic transfer" that requires that the transfer be "initiated by a person other than the consumer," but then excludes transfers "initiated . . . by the consumer). Hence, the superfluidity argument made in the context of this Act carries limited weight.

To be sure, a sister court in this district relied on the surplusage argument in holding the EFTA does not apply to electronically initiated consumer transfers which involved a wire transfer. *Jung v. Discover Bank*, 822 F. Supp. 3d 1098, 1102 (N.D. Cal. 2026). The court reasoned that it must read "transfer of funds" in both Sections 7 and 7(B) to refer to the entire end-to-end transaction in order to avoid rendering Section 7(B) superfluous. *Id.* But *Jung* placed singular reliance on the superfluidity argument. The court did not address how the qualifiers of "transfer of funds" in the two sections differ as noted above. Nor did it address the fact that the canon against surplusage is but one tool in statutory construction, and that the "surplusage canon of statutory interpretation must be applied with the statutory context in mind." *Citibank*, 763 F. Supp. 3d at 514 (quoting *United States v. Bronstein*, 849 F.3d 1101, 1110 (D.C. Cir. 2017)).[2] As discussed below, the statutory context including the legislative history and purpose of the EFTA weigh heavily against this construction.

**iii. <u>"On Behalf of a Consumer"</u>**

Finally, Plaintiffs argue that Section 7(B) should not be construed as exempting transaction

[2] The District of South Carolina also addressed the question of whether the EFTA applies to a transaction composed of an interbank wire transfer with ancillary, intrabank electronic fund transfers in *Walling by Walling v. Bank of America, N.A.*, 782 F. Supp. 3d 280 (D.S.C. 2025). There, the court held that the plaintiff had plausibly alleged a violation of the EFTA. *Id.* at 290. The court generally followed the reasoning of the *Citibank* court in its analysis.

end-to end, but is instead limited to the interbank wire portion. They contend that the phrase "on behalf of a consumer" in describing wire transfers excluded under Section 7(B) supports that construction. *See* Opp'n at 13. As *Citibank* explains, "the ordinary meaning of 'on behalf of a consumer,' . . . is that the financial institution must make the transfer for a consumer." 763 F. Supp. 3d at 512. *Citibank* reasoned that "'on behalf of' meant that, for a transfer to be covered by subsection (7)(B), it would have to be conducted by a financial institution for the benefit or in the interests of a consumer. Thus, when a consumer initially requests a wire transfer . . . that does not fall within subsection (7)(B), since it is an action performed by the consumer . . . themselves." *Id.* *Nelson* endorses this reasoning, holding that the "initial [electronic] transfers were initiated by . . . a fraudulent actor pretending to be [the plaintiff], not by Wells Fargo, so they were not 'made by a financial institution on behalf of a consumer.'" 2026 WL 2797345, at *4.

To the extent that the initial transaction from the Chens' personal accounts to BoA were made by the fraudster, and not by BoA "on behalf of" the Chens, the phrase "on behalf of a consumer" in Section 7(B) supports applying that section's exemption only to the interbank wire portion of the transfers.

**b. <u>Option 2: Section 7 Refers Only to Intrabank Non-Wire Transfers</u>**

Another possible interpretation of the statute is that Section 7 applies only to transfers where a consumer account is credited or debited directly: as applied to the instant case, the first and third intrabank segments of the transactions which did not utilize a wire transfer. Any intermediate interbank wire transfer segments would necessarily be excluded *ab initio* under Section 7.

This interpretation avoids BoA's argument that "transfer of funds" cannot refer to an end-to-end transaction in one section while referring to a single segment of such a transaction in another. Rather, under this interpretation, "transfer of funds" would refer to only a single segment (a single transfer) in both Sections 7 and 7(B). This interpretation thus gives full effect to the qualifiers, with Section 7 applying *only* to those transfers that "debit or credit an account" directly and Section 7(B) excluding *only* those transfers that are made "by means of a [wire transfer] service."



United States District Court
Northern District of California

However, Option 2 requires Section 7(B) be read as clarifying, rather than excepting, because the interbank wire transfer segment would necessarily be excluded from Section 7 in the first instance. Section 7 would only apply to electronically initiated fund transfers to and from consumer accounts. It would not apply to interbank wire transfers. Again, this raises the same superfluidity argument discussed above. As noted above, the *Citibank* court noted that "the EFTA does not call subsection (7)(B) an 'exemption'"; it may merely act as a clarification. 763 F. Supp. 3d at 513.

There is, however, another issue with this interpretation. If Section 7 covers only transfer segments that involve the credit or debit of a consumer account, then ACH transfers that have ancillary interbank segments at either end would be excluded from Section 7's definition. But Section 7(B) excludes ACH transfers from its exception. This would appear to place ACH transfers in a regulatory no-man's-land, neither covered by Section 7 nor excluded from coverage by Section 7(B). Plaintiffs argue that, in fact, *some* ACH transfers would be included under Section 7 because they "can be initiated by the recipient of the funds," rather than via a payment order. Opp'n at 17. This may be true, but there remain at least some ACH transfers "made by a financial institution on behalf of a consumer" that would not be covered by either Section 7 or 7(B). Hence, the reference to the exclusion of ACH transfers in Section 7(B)'s exception to Section 7 would seem to argue against Option 2.

**c. <u>Option 3: Section 7 Refers to End-to-End Transactions, and Section 7(B) Refers to Only Interbank Wire Transfer Segments</u>**

The final possible interpretation of the statute is that Section 7 applies to all end-to-end transactions that start or end with the credit or debit of a consumer account (even if it includes a wire transfers somewhere in the chain of transfers), and Section 7(B) excludes only the bank-to-bank wire transfers that are part of such transactions.

Of course, BoA argues that this impermissibly requires "transfer of funds" to have two different meanings across the two subsections. But as discussed above, "transfer of funds" in fact keeps its ordinary meaning (as a movement of funds from one account to another) under both sections. Instead, it is the *qualifiers* of the term that account for the differing applications under

the two sections.

In addition, Option 3 allows for Section 7(B) to function as an operative exception to Section 7, rather than a clarification. Because the interbank wire transfer would be covered as part of the end-to-end transaction under Section 7, reading Section 7(B) to remove only the interbank segment from the definition of an "electronic fund transfer" aligns with an interpretation of the phrase "does not include" as an exception. This answers the superfluidity argument. Moreover, this avoids the issue described above of Option 2 of putting ACH transfers into a regulatory no-man's-land, neither covered under Section 7 nor excluded from coverage under Section 7(B). Instead, those ACH transfers are, as an initial matter, included as part of an end-to-end transaction under Section 7 and are excepted from the exclusions of Section 7(B).

Option 3 also comports with the understanding that Congress would have had of a consumer "wire transfers" when it enacted the EFTA. As noted above, at that time, wire transfers by consumers were commonly initiated in person, not online. *See Citibank*, 763 F. Supp. 3d at 514. Thus, it makes sense that Congress wrote Section 7(B) "to exclude a bank-to-bank wire originally requested in person by a consumer," but not to remove from the coverage of Section 7 any ancillary intrabank transfers that now occur when a consumer initiates a wire transfer online. *Id.*

**d. <u>Summary</u>**

In sum, there are three possible interpretations of how the EFTA might apply (or not) to the transactions at issue. For the reasons discussed above, the Court finds the third interpretation of the EFTA (Option 3) the most plausible textually. To the extent there is doubt whether Option 3 is the best reading of the EFTA, the Court finds the legislative history and Congress's intent in enacting the EFTA fully supportive and persuasive in its conclusion that the Act should be interpreted consistent with Option 3. The Court also finds its interpretation of the EFTA consistent with the most persuasive case authorities which have examined the issues.

**2. <u>District Court Authority</u>**

As mentioned above, three district court cases have concluded that transactions similar to those at issue here are covered by the EFTA. *See Citibank*, 763 F. Supp. 3d; *Nelson*, 2026 WL

United States District Court
Northern District of California

2797345; *Walling by Walling*, 782 F. Supp. 3d. One has gone the other way. *See Jung*, 822 F. Supp. 3d. For the reasons discussed elsewhere in this order, the Court agrees with the conclusions reached in *Citibank*, *Nelson*, and *Walling by Walling*. Each of the decisions are well reasoned. It finds *Jung* less than persuasive given its focus on superfluidity, which in the case of the EFTA deserves little weight and which in any event is accounted for under Option 3.

BoA points to several cases that it says support its position that the transactions at issue are not covered by the EFTA. However, each of these cases is factually inapposite and otherwise unpersuasive. For instance, in *Bakhtiari v. Comerica Bank, Inc.*, the wire transfers at issue were authorized by the plaintiffs in person, not online or via another electronic terminal. 2024 WL 3405340, at *1 (N.D. Cal. July 12, 2024). Thus, there was no electronic fund transfer between the consumer and their bank that preceded the bank-to-bank wire transfer that could be covered by EFTA. *See Citibank*, 763 F. Supp. 3d at 521 (distinguishing *Bakhtiari*). Similarly, in *McClellon v. Bank of America, N.A.*, a pro se plaintiff alleged that Bank of America "didn't thoroughly verify signatures" before proceeding with the allegedly fraudulent wire transfers. 2018 WL 4852628, at *2 (W.D. Wash. Oct. 5, 2018). Thus, it appears that the plaintiff did not allege that the wire transfers were part of a transaction that was initiated electronically. *See Citibank*, 763 F. Supp. 3d at 520 (distinguishing *McClellon*). And in *Kanji v. Bank of America, N.A.*, the court's statement that "the EFTA does not apply to wire transfers" was made while holding that an allegedly fraudulent transaction was *not* excluded from EFTA coverage because the plaintiff had "failed to allege that the transactions at issue were wire transfers." 2020 WL 8175548, at *2–3 (C.D. Cal. Aug. 25, 2020).

BoA also cites *Wright v. Citizen's Bank of East Tennessee*, 640 F. App'x 401, 404 (6th Cir. 2016), but as *Citibank* noted, the plaintiff in that case "went in person to a branch of her financial institution to request the wire transfer, meaning there was no electronic Payment Order of the type" at issue here. *Citibank*, 763 F. Supp. 3d at 520. BoA cites two other cases, *Pope v. Wells Fargo Bank, N.A.*, 2023 WL 9604555, at *3 (D. Utah Dec. 27, 2023) and *Trivedi v. Wells Fargo Bank, N.A.*, 609 F. Supp. 3d 628, 633 (N.D. Ill. 2022) that "rely on *Wright* but misinterpret its holding." *Citibank*, 763 F. Supp. 3d at 520 n.10. In *Pope*, the District of Utah found that the

EFTA did not apply to a wire transfer that was initiated in person. 2023 WL 9604555, at *2 (describing the plaintiff's driving to the Wells Fargo branch and instructing a bank teller to wire funds); *see also Nelson*, 2026 WL 2797345, at *8 (distinguishing *Pope*). And in *Trivedi*, it was "unclear whether the payment order request was electronic . . . suggesting that the court did not consider whether any individual component of the transaction could be subject to EFTA liability." *Citibank*, 763 F. Supp. 3d at 520 n.10 (citing *Trivedi*, 609 F. Supp. 3d at 630–31).

BoA's other cases are similarly unpersuasive. In *Nazimuddin v. Wells Fargo Bank N.A.*, the plaintiff did not make, and the court thus did not consider, an argument that the wire transfers at issue consisted of multiple transfers. 2024 WL 3431347, at *2 (S.D. Tex. June 24, 2024), *report and recommendation adopted*, 2024 WL 3559597 (S.D. Tex. July 25, 2024), *aff'd* 2025 WL 33471 (5th Cir. Jan. 6, 2025); *see also Nelson*, 2026 WL 2797345, at *8 ("The Fifth Circuit [in affirming *Nazimuddin*] found that the plaintiff had abandoned the argument that such transactions consist of multiple transfers and therefore refused to consider it."). In *Fischer & Mandell LLP v. Citibank, N.A.*, the plaintiff likewise did not present an argument that the wire transfer consisted of multiple transfers, and it was not necessary for the court to reach the question because the wire transfers, apart from an unauthorized check, were not themselves unauthorized. 2009 WL 1767621, at *3–4 (S.D.N.Y. June 22, 2009); *see also Citibank*, 763 F. Supp. 3d at 519–20 (distinguishing *Fischer*). In *Bodley v. Clark*, the plaintiff alleged that the bank debited his account without notification and failed to allege that the unauthorized transfer was "initiated through an electronic terminal, telephone, computer, or magnetic tape," so as a threshold matter, the transfer would not have met the definition of an electronic fund transfer. 2012 WL 3042175, at *4 (S.D.N.Y. July 23, 2012); *see also Citibank*, 763 F. Supp. 3d at 521 n.11 (distinguishing *Bodley*).

Finally, in *Stepakoff v. IberiaBank Corp.*, the plaintiff had requested a wire transfer by telephone in order to restrict her mother's access to the funds, but her mother visited the bank in person seeking to cancel the wire request. 637 F. Supp. 3d 1309, 1311 (S.D. Fla. 2022). The bank closed the account and sent a check to the plaintiff's mother for the full amount of funds in the account. *Id.* The plaintiff sued the bank under the EFTA for failure to make an EFT in a timely



United States District Court
Northern District of California

manner. *Id.* Notably, the plaintiff did not argue that the EFTA attached to some electronic payment ancillary to the uncompleted wire transfer, and the court did not have any reason to consider such an argument. *Id*; *see also Citibank*, 763 F. Supp. 3d at 520–21 (distinguishing *Stepakoff*).

The cases that have examined the application of the EFTA to a multi-part transaction similarly to that involved in the case at bar and found those parts of the transaction which did not involve a wire transfer remain the most persuasive authorities on point.

**3. Legislative History and Congressional Purpose**

Where statutory text is ambiguous, "we may 'look to other interpretive tools, including the legislative history' in order to determine the statute's best meaning." *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1181 (9th Cir. 2013) (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 567 (2005)). Here, Congress's explicit purpose in enacting the EFTA, the text of Article 4A of the UCC, and regulatory guidance counsel toward applying the EFTA to at least the first and third segments of the transactions.

On its own terms, the "primary objective" of the EFTA is "the provision of individual consumer rights." 15 U.S.C. § 1693. Congress's purpose in enacting the Act is further evidenced by the legislative history, which makes clear that Congress's goal was to "provide for consumer rights and safeguards in electronic fund transfer systems." S. Rep. No. 95-915 (1978). The Act's "principal purpose" was "the creation of substantive consumer rights." *Id.* During its enactment, Congress was particularly concerned about the "unique risks" presented by card-initiated EFTs, such as via an ATM, because "the face-to-face contact" involved in earlier types of fraud would not be a deterrent where "the thief needs only to utilize a computer terminal to withdraw a consumer's money." *Id.* Because of this risk, Congress found that "protecting the consumer from serious loss [was] of central importance." *Id.* Moreover, the definition of "electronic fund transfer" was intended to give the Federal Reserve Board "flexibility in determining whether new or developing electronic services should be covered by the Act." *Id.* Whether a new service should be covered requires a determination of, among other things, "whether coverage is necessary to achieve the Act's basic objectives." *Id.*

United States District Court
Northern District of California

Statements by legislators underscore congressional concern about protecting consumers in the face of new and then-unknown technologies and banking services. While floor statements "are not given the same weight as some other types of legislative history," *Kenna v. U.S. Dist. Ct. for C.D. Cal.*, 435 F.3d 1011, 1015 (9th Cir. 2006), here they add context to the backdrop against which Congress was legislating when it enacted the EFTA. As the *Nelson* court explained, statements by members of Congress illustrate that legislators had a "focus on consumer interests" and "were highly aware . . . that any legislation would ultimately govern services and technologies not yet in existence or common use at the time the legislation was passed." 2026 WL 2797345, at *7–8. For instance,

> [o]ne member of the House of Representatives, speaking in support of one of the draft versions of the EFTA, explained that the one of the "two most crucial problems presented by electronic banking" was "who should bear liability for unauthorized transfers," and that there was "no Federal law to protect consumers in this regard."

*Id.* at *7 (quoting 124 Cong. Rec. 25729 (1978)). "Other supporters described the legislation as a 'first important step to protect the users and prospective users' of electronic fund transfers and emphasized that '[m]any consumers [were] frightened of banking by computer and what they view[ed] as a dehumanized approach to handling their money.'" *Id.* (quoting 124 Cong. Rec. 25735 (1978)). And when

> [d]ebating a draft of the EFTA, one House member explained that he was "not sure that even the most enthusiastic advocate of electronic fund transfer systems [could] envision their eventual applications," but nonetheless believed it was "imperative" that Congress established "certain fundamental rights, remedies, and responsibilities for all participants in the utilization of electronic fund transfer services."

*Id.* at *8 (quoting 124 Cong. Rec. 25735 (1978)). Thus, members of Congress were focused on protecting consumers against fraud in the process of electronic transfers, particularly as new technologies evolved and exposed consumers to new and increased risks.

Congress's intended flexibility in addressing risks to consumers from new technology suggests that the types of transactions at issue in this case, initiated through an online banking app on an iPhone, should be covered by the EFTA. At the time the EFTA was passed, wire transfers were generally initiated in person or over the phone. The ability to initiate a transaction that

includes a wire transfer online, either through a website or app, was not available at the time the EFTA was initiated, and yet it appears that this is the kind of new and then unknown technology that Congress anticipated; this forward-looking anticipation warranted the flexible language used in drafting the EFTA. *See Nelson*, 2026 WL 2797345, at *8 ("While the EFTA's adopters 'might not have anticipated their work would lead to this particular result,' they were highly aware that the EFTA would govern transactions they did not know of or anticipate in 1978." (quoting *Bostock v. Clayton Cnty.*, 590 U.S. 644, 653 (2020))).

Congress's goal of protecting consumers indicates that at least the first and third segments of the transactions here should be covered by the EFTA, lest consumers suffering the very kind of harm about which Congress was concerned would be left unprotected from its reach. If a fraudster were to initiate an unauthorized transfer between a consumer's account and the fraudster's account at that same banking institution, and the transaction did not include a wire transfer, it is undisputed that the EFTA would apply to the full transaction. What difference, in terms of consumer protection, should it make if money extracted by the fraudster (who initiated an electronic transfer from the consumer victim's account) were ultimately transferred from the victim's bank to the fraudster's bank by way of an interbank wire transfer? The fraudster's conduct and use of electronic transfer to effectuate the fraud and inflict the loss suffered by the victim remain the same irrespective of the fact that there was an intermediary transfer between banks by wire. In this case, the fact that the Plaintiffs' stolen funds were at one point transferred to another bank by wire is an incidental happenstance. The fact remains that the kind of alleged fraud in effecting the electronic transfer of the Plaintiff's funds from their personal account is precisely the kind of harm Congress sought to address in enacting the EFTA. Moreover, construing the exclusion of Section 7(B) to apply only to the bank-to-bank transfer by wire – a highly commercial transaction – is entirely consistent with an interpretation that results in the application of the UCC rather than the consumer-oriented EFTA. The risk of typical consumer fraud in the bank-to-bank wire transfer would appear to be exceedingly small, and thus the protection of the EFTA would be unnecessary. The exemption of Section 7(B) for that bank-to-bank wire transfer while maintaining EFTA protection for the intrabank consumer account transfers makes perfect sense and aligns with the



United States District Court
Northern District of California

purpose of the Act.

**4. <u>The UCC and Regulatory Guidance</u>**

In interpreting the ambiguous statutory text of the EFTA, the Court also looks to extrinsic evidence in the UCC and regulatory guidance implementing both the EFTA and the UCC. While courts "must exercise independent judgment in determining the meaning of statutory provisions," they may "seek aid from the interpretations of those responsible for implementing particular statutes." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). "[A]n agency's interpretation of a statute 'cannot bind a court,'" *id.* at 402 (quoting *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98 n.8 (1983)), but may have "power to persuade" where it is informed by expertise and is well-reasoned. *Skidmore v. Swift*, 323 U.S. 134, 140 (1944).

The UCC contemplates that transfer of funds can be broken into segments, some of which are covered by the UCC while other segments are governed by the EFTA. While interpretations of a different statute are of limited utility, *In re Joye*, 578 F.3d 1070, 1078 (9th Cir. 2009), the UCC's interrelationship with the EFTA does provide some context and guidance. Article 4A of the UCC, codified in 1989, and its codified version under California statute provide context of how the overall regulatory scheme for wire transfers functions. Section 4A-104, codified in California as California Commercial Code § 11104, refers to "the *series* of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order." Cal. Com. Code § 11104(a) (emphasis added); *see also* UCC § 4A-104(a). Importantly, the UCC "does not apply to a funds transfer *any part* of which is governed by the [EFTA]." UCC § 4A-108; Cal. Com. Code § 11108(a) (emphasis added). This indicates that a "funds transfer" may be composed of multiple "parts," and that the EFTA may apply to some part of that transfer. The UCC thus dovetails well with the interpretation of the EFTA that permits its application to the first and third segments of the transaction at issue in the case at bar.

Early regulations likewise recognized the possible segmentation of funds transfers. The Federal Reserve promulgated Regulation J in 1980 to regulate check payments and interbank wires. In 1990, just one year after Article 4A was added to the UCC, the Federal Reserve Board revised Regulation J to make it consistent with the new Article 4A. 55 Fed. Reg. 40,791 (Oct. 5,

1990). That revision "set[] out the rules governing funds transfers through Fedwire" and included commentary offering the agency's interpretation of the regulation. *Id.* In the revision, the Federal Reserve clarified that

> [a] funds transfer from a consumer originator or a funds transfer to a consumer beneficiary could be carried out in part through Fedwire and in part through an automated clearing house or other means that is subject to the Electronic Fund Transfer Act or Regulation E. In these cases, *subpart B [of Regulation J] would not govern the portion of the funds transfer that is governed by the [EFTA] or Regulation E*.

*Id.* at 40,804 (emphasis added). Thus, it is possible for a transaction that is composed of multiple smaller transfers to be covered in part by the EFTA and in part by Article 4A. To be sure, commentary to the regulation also stated that "Fedwire funds transfers *to or from consumer accounts* are exempt from the Electronic Fund Transfer Act and Regulation E." *Id.* (emphasis added). This would appear to cut the other way, indicating that an end-to-end transfer which involves a wire transfer is exempt from the EFTA, because the interbank segment of a wire transfer cannot be sent directly to or from a consumer account. However, in the regulatory hierarchy, the regulation is entitled to greater consideration than commentary on the regulation. *Kisor v. Wilkie*, 588 U.S. 558, 580 (2019) (holding that a court should only defer to an agency's interpretation of its own regulation in certain limited circumstances).

In addition, commentary to Regulation E has recognized that the EFTA may apply to some segments of a transaction even where a portion of the transaction is a wire transfer governed by Regulation J. As the *Nelson* court noted,

> since 1996 the official commentary for Regulation E has explained that "[t]o ensure that the rules for all fund transfers through Fedwire are consistent, the Board of Governors used its preemptive authority under UCC section 4A-107 to determine that subpart B of the Board's Regulation J, including the provisions of Article 4A, applies to all fund transfers through Fedwire, even if a portion of the fund transfer is governed by the EFTA. The portion of the fund transfer that is governed by the EFTA is not governed by subpart B of the Board's Regulation J."

*Nelson*, 2026 WL 2797345, at *6 (quoting 12 C.F.R. pt. 1005, Supp. I, cmt. 3(c)(3)2). And the Federal Reserve Board's 1996 revisions to its Official Staff Interpretation of Regulation E note the risk "of subjecting consumers to full liability for unauthorized transfers merely because some part



United States District Court
Northern District of California

United States District Court
Northern District of California

of the transfer, which would ordinarily be covered by Regulation E, is made via Fedwire." 61 Fed. Reg. 19,679–80 (May 2, 1996).

BoA points out that several other banking regulators and consumer groups have published statements indicating that wire transfers are regulated as the end-to-end transfer, not as a series of individual transactions. *See, e.g.*, FDIC, *Consumer Compliance Examination Manual* 809 (2026), https://www.fdic.gov/consumer-compliance-examination-manual; *Message from the Director–Wire Transfer Scams and Ways to Protect Yourself*, OCC (Oct. 2026), https://www.helpwithmybank.gov/about/message-from-director/past-message-2023-july/index-past-message-2023-july.html; U.S. Dep't of Treasury, FinCEN, *Feasibility of a Cross-Border Electronic Funds Transfer Reporting System Under the Bank Secrecy Act* 55 (Oct. 2006), https://www.fincen.gov/system/files/shared/CBFTFS_Complete.pdf. However, as the *Citibank* court explained, "in addition to exhibiting much of the same imprecision already described," these statements "are simply too attenuated from the passage of the EFTA to be probative of the enacting Congress's intent." 763 F. Supp. 3d at 518. Moreover, while these statements may be informative, agency positions are "not binding on federal courts and do[] not take precedence over the language of the statute," *Nelson*, 2026 WL 2797345, at *6 (citing *Loper Bright Enters.*, 603 U.S. at 394), but instead are afforded only such deference as their persuasive power commands. The Court does not find these statements consistent with the most plausible textual interpretation of the EFTA and its legislative history and purpose.

**5. <u>Summary</u>**

In sum, the Court adopts the third interpretation of the application of the EFTA described above: **Section 7 applies to a full, end-to-end transaction which is "initiated through an electronic terminal, telephone instrument, or computer" to instruct a financial institution to "debit" Plaintiffs' account and "credit" the fraudster's account. 15 U.S.C. § 1693a(7). Section 7(B) then removes from the EFTA's coverage the interbank wire transfer segment of that transaction.** This interpretation is supported by the most plausible reading of the text of the statute, conforms best to Congress's purpose to protect consumers from fraudulent electronically initiated transactions "in an era of rapid technological change," *Citibank*, 763 F. Supp. 3d at 515,

accords a coherent interrelationship between the EFTA and the UCC, and is supported by the most persuasive regulatory interpretations of the Act. In sum, the EFTA applies to the first and third segments of the fraudulent transactions in the instant case. Plaintiffs herein are entitled to the protection of the Act for those segments of the transactions.

**B. <u>Plaintiffs Plausibly Pled an Unauthorized Transfer.</u>**

The EFTA and Regulation E define an "[u]nauthorized electronic fund transfer" as "an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit." 15 U.S.C. § 1693a(12); 12 C.F.R. § 1005.2(m). When consumers are induced by a fraudster to initiate a transfer, that transfer is not unauthorized under the EFTA; but when the transfer is initiated by someone other than the consumer and is done fraudulently without the consumer's knowing consent, it is "unauthorized." *See, e.g.*, *Tristan v. Bank of Am.*, 2023 WL 4417271, at *10 (C.D. Cal. June 28, 2023) (dismissing EFTA claim where plaintiff initiated transfers at third party's request); *Sanchez v. Navy Fed. Credit Union*, 2023 WL 6370235, at *22–23 (C.D. Cal. Aug. 14, 2023) ("The plain meaning of 'unauthorized' thus includes transactions where the fraudster gains access to the account and 'initiates' the transfer without authority, and excludes transactions where the consumer chooses to initiate a transfer to another individual, even if that person turns out to be a fraudster.").

Plaintiffs have plausibly alleged that the transfers from their BoA accounts were unauthorized. Plaintiffs plead that the fraudster initiated a FaceTime call with Mr. Chen, during which he was able to obtain remote access to Mr. Chen's iPhone and the Bank of America app on the phone. Using that access, and without Plaintiffs' knowledge or permission, the fraudster then initiated the two transfers in dispute. Where Plaintiffs' prior complaint left ambiguous who had initiated the transfers, the operative complaint alleges that the fraudster did so, albeit through Mr. Chen's iPhone.

BoA purports to find "contradictions" in Plaintiffs' allegations that the fraudster allegedly gained access to Mr. Chen's iPhone using the remote control feature – a feature that requires the user granting permission – but that Mr. Chen does not recall allowing remote access to his phone.



United States District Court
Northern District of California

Mot. at 26. Drawing inferences in favor of Plaintiffs, as the Court must at this stage, Mr. Chen granted the fraudster remote access to his phone without understanding that he was doing so and without intending to do so. This type of inadvertent and unknowing access does not grant the fraudster "actual authority" to initiate the transfers. 15 U.S.C. § 1693a(12). Thus, Plaintiffs have plausibly plead an unauthorized transfer as that term is defined in the EFTA.

The motion to dismiss is **DENIED**.

**IT IS SO ORDERED**.

Dated: October 22, 2026



EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California